377 So.2d 193 (1979)
Adelita Quejado GREEN, Appellant,
v.
The STATE of Florida, Appellee.
No. 78-894.
District Court of Appeal of Florida, Third District.
July 17, 1979.
*195 Black & Denaro and Roy E. Black, Miami, for appellant.
Jim Smith, Atty. Gen., and James H. Greason, Asst. Atty. Gen., for appellee.
Before PEARSON, BARKDULL and HUBBART, JJ.
HUBBART, Judge.
This is a criminal prosecution for grand larceny against an attorney arising out of certain financial transactions which involve two of the attorney's former clients. The testimony is in conflict as to whether the attorney invested certain of the clients' monies according to the client's instructions or whether, on the contrary, the attorney misappropriated the funds in question. The jury believed the latter and convicted the defendant as charged. After a prison term was imposed, the defendant appeals.

I
The first issue involved in this appeal is whether there are any circumstances under which a trial court is constitutionally required to deny the electronic media[1] access to the courtroom to cover and report judicial proceedings in the courts of this state. We hold that upon a demonstration of prejudice to the defendant in a criminal case, which inter alia includes a showing that such electronic media coverage of court proceedings in the cause would render an otherwise competent defendant incompetent to stand trial, the trial court is constitutionally *196 required to prohibit electronic media coverage of such court proceedings under the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Florida Constitution. As the trial court herein summarily denied a defense motion to prohibit electronic media coverage of the trial based on the above ground without holding an evidentiary hearing to determine whether such motion was well-founded, we reverse and remand for a new trial.

A
On December 27, 1976, the defendant Adelita Quejado Green was charged in a three count information, one count of which was eventually nolle prossed, with grand larceny by embezzlement or misappropriation in the Circuit Court for the Eleventh Judicial Circuit of Florida. On February 7, 1977, based on the defendant's recent mental breakdown caused in part by the circumstances giving rise to this prosecution, the trial court pursuant to the state's motion appointed three psychiatrists to conduct an examination of the defendant as to her sanity and thereafter to file a written report with the court setting forth: (a) a general report on the defendant's mental condition, (b) an opinion as to the capacity of the defendant presently to properly answer the charges against her and aid in her own defense and stand trial, (c) an opinion as to whether at the time of the alleged offense the defendant knew right from wrong and the nature and consequences of her acts, and (d) an opinion as to whether the defendant should be given psychiatric treatment, and, if so, recommendations as to the type of such treatment.
The court-appointed psychiatrists subsequently conducted extensive mental examinations of the defendant on more than one occasion reviewed her past mental history and filed extensive written reports with the court. These reports all concluded that the defendant was mentally incompetent to stand trial, that she was suffering from a severe depression of psychotic proportions, and was extremely suicidal.[2] These reports *197 indicated that the defendant had previously attempted suicide in September, 1976, that she was placed in a mental hospital at the Institute for Living in Hartford, Connecticut from November 3, 1976 to December 30, 1976, that she was subsequently placed in Cedars of Lebanon Hospital in Miami Beach, January 3, 1977  February 4, 1977, under the psychiatric care of Dr. Arthur Stillman, and that she has since been receiving outpatient psychiatric care from Dr. Stillman three times weekly since her discharge from the hospital.
On March 21, 1977, the defendant through counsel filed a written waiver of speedy trial attaching thereto an affidavit of defense counsel detailing the prior and continuing severe mental history of the defendant and the virtual impossibility of communicating with the defendant concerning the case. Also attached is a mental status report of the defendant by her treating psychiatrist, Dr. Stillman, confirming in detail the psychotic state of the defendant. Accordingly, the trial of the cause was postponed while the defendant continued to receive out-patient psychiatric care.
On July 13, 1977, the trial court entered a second order appointing the same above three psychiatrists to re-examine the defendant and file written reports on the same questions as stated in the first such order. This time the psychiatrists all agreed that the defendant's mental condition had improved although she was still mentally disturbed, and that, at present, the defendant was mentally competent to stand trial.[3] These reports, like the prior psychiatric reports previously filed in this case, did not determine whether television coverage of the defendant's trial would adversely affect the defendant's competency to stand trial as such a determination was *198 not called for in either of the orders appointing the psychiatrists in this cause.
The trial court held an evidentiary hearing to determine the defendant's competency to stand trial and reviewed the above psychiatric reports. On September 27, 1977, the trial court entered an order adjudging the defendant competent to stand trial but, so far as the record reveals, made no inquiry into what impact, if any, electronic media coverage would have on the defendant's competency to stand trial.
On October 6, 1977, the defendant filed a motion to prohibit the electronic media from televising or photographing any of the court proceedings in this cause on the ground that her fragile mental condition was such that any electronic media coverage of the court proceedings herein would have an adverse effect on her mental competency to stand trial, to properly assist counsel and to mount an effective defense. The defendant prayed that the motion be set for an evidentiary hearing to determine the truth of this claim. In addition to setting forth the history of the defendant's mental illness as detailed above, the defendant attached an affidavit by defense counsel stating that he had talked to one of the court-appointed psychiatrists in this cause and that this psychiatrist (Dr. Sanford Jacobson) had concluded:
"... that appearance of the electronic media in this case would adversely affect the defendant. Her anxiety and depression will be heightened and actively interfere with her ability to defend herself and to communicate with counsel."
Defense counsel's affidavit further states:
"That based upon his extensive contact with the defendant over a ten month period he has concluded that extensive media coverage of the trial will severely lessen defendant's ability to properly defend herself. Up to a month ago this defendant was unable to actively assist in the preparation of her defense: she was totally apathetic, had no interest in discussing the details of the transactions involved, and continually expressed extreme depression concerning the future. Her condition is still very fragile; articles in newspapers, radio and television affect her greatly. The intrusion of cameras into the courtroom would paralyze her with apprehension and consequently prevent her from defending herself."
Also attached to the defendant's motion to prohibit electronic media coverage is a report by Dr. Stillman, the defendant's treating psychiatrist, which concludes that the presence of the electronic media at the trial of this cause would have an adverse impact on the defendant's competency to stand trial.[4]
*199 On October 18, 1977, the trial court heard argument on the above motion, but declined to take any testimony thereon. On November 16, 1977, the trial court entered a written order denying the motion.
On January 30, 1978  February 3, 1978, the defendant was brought to trial and the court proceedings thereon were fully covered by the electronic media, portions of which were shown daily on television news broadcasts. At the outset of the trial, the defendant renewed her pre-trial motion to prohibit electronic media coverage of court proceedings in this cause, which motion was summarily denied without conducting an evidentiary hearing. Throughout the trial, the defendant through counsel objected to the electronic media coverage of this trial stating that such coverage was adversely affecting the defendant's ability to confer with counsel during the trial. The trial court overruled all such objections without making any inquiry as to the truth of the defendant's claims.
The defendant was convicted of two counts of grand larceny and was sentenced to a term of years in the state penitentiary. This appeal follows.

B
The Florida Supreme Court in Petition of Post-Newsweek Stations, Florida, Inc., 347 So.2d 402 (Fla. 1977), 347 So.2d 404 (Fla. 1977), established a one year pilot project in this state whereby the electronic media, including still photography, could at their discretion televise and photograph judicial proceedings, civil, criminal and appellate, in all courts in the state of Florida subject to a detailed set of standards regulating the types of equipment, lighting, noise levels, audio pickup, etc., employed by the electronic media. The consent of any or all of the participants in the trials was not made a requirement for this pilot project which began at 12:01 a.m. on July 5, 1977 and ended at 11:59 p.m. on June 30, 1978. The trial in the instant case was held during this one year pilot project pursuant to the above standards.
Subsequent thereto, the Florida Supreme Court in In Re Petition of Post-Newsweek Stations, Florida, Inc., 370 So.2d 764 (Fla. 1979), decided to make the pilot project a permanent program in Florida courts pursuant to revised standards very similar to the prior standards. The Court did so pursuant to its supervisory authority over the courts of this state under Article V of the Florida Constitution rejecting any argument by the electronic media that the First and Sixth Amendments to the United States Constitution mandated entry of such media into judicial proceedings.
In what must be considered a leading decision on this subject in the country, the Court, speaking through Mr. Justice Sundberg, addressed directly the constitutional objections based on Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), which had been raised against authorizing electronic media coverage of criminal trials. After thoughtfully analyzing both the Estes plurality opinion and the decisive concurring opinion of Mr. Justice Harlan, the Court concluded that there was no absolute federal constitutional bar to televise trials in criminal cases. Specifically, the Court held that "without demonstration of prejudice, there is no per se proscription against electronic media coverage of judicial proceedings imposed by the fourteenth amendment to the United States Constitution nor by article I, section 9, Florida Constitution." 370 So.2d at 774.
Although the Court did not discuss what might constitute a demonstration of prejudice by the defendant which would trigger a due process violation and thus bar electronic media coverage of a criminal trial, it seems clear from the decision that prejudice would exist if the case, like Estes, was a *200 heavily publicized and highly sensational affair tried in a carnival-like proceeding incessantly interrupted by reporters, cameras, and cameramen. Beyond that, the Court quite properly left for future decisions a more complete definition of the parameters of prejudice.
In this connection, however, it seems elementary that the advent of electronic media coverage of judicial proceedings as approved by the Court did not change the long established law that it is a violation of due process, as well as our basic statutory and procedural law, to try a defendant for a crime (a) when he is mentally incompetent to stand trial, Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); Horace v. Culver, 111 So.2d 670 (Fla. 1959); Perkins v. Mayo, 92 So.2d 641 (Fla. 1957); § 918.15(1), Fla. Stat. (1977); Fla.R.Crim.P. 3.210(a)(1); or (b) when the evidence in the case raises a reasonable doubt as to his competency to stand trial and no evidentiary hearing is thereafter held by the trial court to resolve the competency issue. Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); State ex rel. Deeb v. Fabisinski, 111 Fla. 454, 152 So. 207, 156 So. 261 (1933); § 918.15(2), Fla. Stat. (1977); Fla.R.Crim.P. 3.210(a)(2). In this state "[a] person . . is incompetent to stand trial ... if he does not have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or if he has no rational as well as factual understanding of the proceedings against him." § 918.15(1), Fla. Stat. (1977); Fla.R.Crim.P. 3.210(a)(1).
It also seems clear that the advent of electronic media coverage of a criminal trial carries with it, at times, the risk of rendering a borderline competent defendant incompetent to stand trial and that a case involving such a defendant must be handled with special care by the trial court. A mentally disturbed, but technically competent defendant, like any other defendant, must face a much greater public exposure if his trial is televised. As a result, he is almost certain to suffer a greater level of anxiety than he would if his trial were not televised. This increased anxiety may impair his ability to consult with counsel during trial with a reasonable degree of rational understanding or it may impair his rational as well as factual understanding of the proceedings against him. If either event be the case, the defendant has, in our view, demonstrated prejudice under Post-Newsweek, supra, so as to exclude electronic media coverage of the judicial proceedings in the case. To rule otherwise would be to sanction the trial of a competent defendant rendered incompetent by electronic media coverage, a result which our law does not and cannot permit.

C
In the instant case, we must reject any contention that the defendant had an absolute constitutional right at her option to exclude electronic media coverage of the judicial proceedings in this cause. We have no problem, however, in determining that the defendant sufficiently alleged prejudice of constitutional due process proportions in her motion to prohibit electronic media coverage of the cause so as to require an evidentiary hearing thereon. The motion, together with the supporting documents and record, in the case, raise grave doubts, in our view, as to whether the impending electronic media coverage of this trial would have such an adverse psychological impact on this borderline competent defendant so as to render her incompetent to stand trial. Although the trial court adjudged the defendant competent to stand trial, no determination or inquiry was ever made by the trial court as to whether such competency would exist in the event the trial were televised. When that issue was properly raised for the first time in the defendant's above-stated electronic media motion, it was incumbent upon the trial court to conduct a full evidentiary hearing thereon which, at a minimum, should have included testimony or reports by the court-appointed psychiatrists as to the impact which electronic media coverage of this trial would have on the defendant's competency *201 to stand trial. Such was not accomplished in this case.
We further find nothing in the trial record of this cause which dispels the reasonable doubt that the defendant may not have been competent to stand trial given the electronic media coverage of the trial herein. To the contrary, the record is replete with objections by defense counsel that the televising of his conferences with the defendant in court was so upsetting to the defendant as to effectively prevent any meaningful communication between lawyer and client during the progress of the trial. Consistent with its prior ruling, the trial court did not inquire into any of these claims and summarily overruled the objections. As such, we must conclude that the trial court committed reversible error in denying the defendant's motion to prohibit electronic media coverage of this cause without first conducting an evidentiary hearing thereon.

II
The second issue involved in this appeal is whether the trial court committed reversible error in denying without a hearing the production at trial of certain evidence requested of a witness under a subpoena duces tecum issued by the defendant, and in excluding from evidence at trial the testimony of certain defense witnesses. For the reasons which follow, we conclude that individually each of these rulings constitute reversible error. We, accordingly, reverse and remand for a new trial.

A
The defendant Adelita Quejado Green was at all times material to this cause a member of the Florida Bar and a practicing lawyer in Miami, Florida, from 1971-1976. As a first generation American of Chinese-Philippine extraction, the major part of her law practice consisted of representing foreigners, primarily overseas Chinese, in various business matters. Among such clients were a group of Chinese businessmen in Jamaica, including George Chin and Vincent Chuck. The defendant represented Mr. Chin and Mr. Chuck in their efforts to obtain resident visas in the United States and also invested certain of their monies, some of it abroad, in their behalf from established trust funds. The clients lost all of the monies in these trust accounts due to bad investments abroad by the defendant and these alleged defalcations formed the basis for the two grand larceny charges herein. The jury, based on the circumstances of these complex transactions, believed that the investments in question were never authorized by the clients from the trust funds and that the defendant had misappropriated the monies in question. The defendant claimed, and the jury did not believe, that the investments which were lost had been authorized by the clients.
The conflict in the trial testimony of Mr. Chin and the defendant was particularly at odds. Mr. Chin testified that the money was given to the defendant to set up a routine trust fund for his son because Mr. Chin was about to undergo a serious operation for a lung ailment and was afraid he might die. Contrary to the defendant's testimony, he denied that the defendant was authorized to clandestinely invest these monies in his behalf in order to protect his assets from possible expropriation by the Jamaican government. The defendant so testified and stated that she had been authorized to make the clandestine investments in question for Mr. Chin, and that he had never mentioned anything about an operation for a lung ailment or that he was afraid of dying or that the trust fund was to be set up for his son.
To substantiate the defendant's testimony and discredit Mr. Chin's testimony as stated above, the defendant did two things: (a) she issued a subpoena duces tecum for trial to Mr. Chin directing him to bring certain of his business and financial records and papers to trial;[5] and (b) she called Dr. *202 Raymond Cohen, Mr. Chin's physician, to establish through medical records that on the date in question Mr. Chin had no serious medical problems, that he was not going to undergo a lung operation, and that he was in no danger of dying; she also called and attempted to elicit similar testimony from Ethlyn Wong, an acquaintance of Mr. Chin. The trial court denied, without conducting a hearing, the production of the exhibits sought by the defendant at trial on the subpoena duces tecum. In particular, the trial court sustained the state's objection when the defendant asked Mr. Chin on cross-examination to produce the documents requested by the subpoena duces tecum without examining such documents. The trial court further ruled that the above testimony of Dr. Cohen and Ethlyn Wong was inadmissible at trial as being testimony on a collateral matter.

B
The law is well-settled that the defendant in a criminal case is constitutionally entitled to compulsory process to have brought into the trial court any material evidence shown to be available and capable of being used by him in aid of his defense, including the beneficial enjoyment of the compulsory process of a subpoena duces tecum for that purpose. The constitutional right to compulsory process means not only the issuance and service of a subpoena by which a defense witness is made to appear, but includes the judicial enforcement of that process and the essential benefits of it by the trial court. With reference to the latter, a trial court has no more authority to refuse to enforce for a defendant's benefit the production of the evidence available to be procured and for which compulsory process has been issued than to deny the process itself in the first instance. State ex rel. Brown v. Dewell, 123 Fla. 785, 167 So. 687 (1936). Whenever the state objects, as here, to the production of documents under a subpoena duces tecum, the proper practice is for the trial court to examine the subpoenaed documents to determine their relevancy resolving any doubts in favor of their production. Vann v. State, 85 So.2d 133, 136 (Fla. 1956). The defendant also has a constitutional right to compulsory process of witnesses to produce testimony which is admissible in the cause for which he is on trial. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

C
In the instant case, it is clear beyond any hope of successful contradiction that the trial court, contrary to established law, refused to enforce the subpoena duces tecum in this case without conducting a hearing to determine the relevancy of the subpoenaed documents. On its face, it cannot be said that such documents were totally irrelevant to the cause and, accordingly, a hearing was in order after the state objected to the production of such documents at trial. We emphasize that the trial court should have conducted a hearing to determine the relevancy of such documents, not their admissibility, and to thereafter turn over any such relevant documents to defense counsel. We express no opinion on, and the trial court at the hearing would not be required to determine, the admissibility of such evidence. We are concerned only as to the production of such evidence for the inspection of defense counsel pursuant to the subpoena duces tecum.
We are also persuaded that the trial court was in error in ruling that Dr. *203 Cohen's testimony and Ethlyn Wong's testimony was not relevant to the case at hand. It is clear that these witnesses would have given testimony directly contrary to that of Mr. Chin concerning the motive for setting up the trust funds in question. Such testimony refuted Mr. Chin's claim that he set the trust funds up for his son because he was afraid of dying in an upcoming lung operation. Both Dr. Cohen and Ethlyn Wong were prepared to testify that Mr. Chin had no such lung operation, that he was in good health, and that he was in no danger of dying. We think this directly touches the relevant issues involved in this case and that it was reversible error for the trial court to exclude such testimony at the trial of this cause.

III
We have examined the other contentions made by the defendant upon this appeal and find them to be without merit. The judgments of conviction and sentences herein are accordingly reversed and the cause remanded to the trial court with directions to order a new trial in conformance with the views expressed in this opinion.
Reversed and remanded.
NOTES
[1] Unless the context otherwise requires, "electronic media" shall be used as a generic term which encompasses television, film and video tape cameras, still photography cameras, tape recording devices and radio broadcast equipment.
[2] "It is my opinion that this individual is suffering from a severe depression which causes diminished mental capacity to properly aid counsel in the preparation of her defense and stand trial. I feel that she knows right from wrong and understands the nature and consequences of her acts. I believe the same was true at the time of her alleged offense. Despite the outcome of her case, she will need close supervision on a psychiatric basis, because she is potentially dangerous to herself. She is presently receiving intensive psychotherapy and should continue same. I would also suspect that other members of her family should receive counseling or treatment as well. If left unattended, she will most probably destroy herself. Further hospitalization should be considered." Report of Dr. Charles B. Mutter, dated February 28, 1977.

"At present it is felt that her depression is of psychotic proportions. At present I feel that her illness significantly impairs her ability to aid and assist counsel in her defense and to understand the nature of the charges against her. When specifically asked about her ability to confer with her attorney, she described herself as being unable to concentrate and be attentive. While stating that she did not understand the charges, I felt that in spite of her depression, she has a factual understanding of them, although not a rational understanding.
It is very difficult to determine the client's mental status at the time of the alleged offense. Since these events occurred over a period of three years, one cannot conclude that her mental state was necessarily the same throughout that period of time. I therefore cannot offer any conclusive statement about her ability to meet the test for criminal responsibility without additional information regarding her behavior at specific points in time. Finally, it is my opinion that the defendant is in need of further treatment and that hospitalization could be considered." Report of Dr. Sanford Jacobson, dated March 11, 1977.
"I believe that she has suffered from a manic-depressive illness, and that she presently shows mixtures of symptoms including both depression as well as pressure of speech, increased mental activity, circumstantiality and I consider her to be potentially suicidal. Paranoid ideation persists. There is an underlying personality disorder of many years standing manifested by obsessive compulsive features, hysterical symptoms and some passive aggressive patterns. It is my opinion that she is presently incapable of properly answering the charges against her and aid in her own defense and stand trial. It is also my opinion that at the time of the alleged offense with which she is charged she technically knew the difference between right and wrong and the nature and consequences of her acts. However, her developing mental illness appears to have interfered with the proper use of judgment and her ability to handle her affairs in an appropriate manner. As noted I believe that she is still sick and continues to be suicidal. She should remain in treatment and should be watched carefully, especially should her depression increase with its potential for suicide. Since the pressures that have existed at home continue it may be to her advantage to be hospitalized to remove her from the psychologically traumatic situations." Report of Dr. William Corwin, dated March 15, 1977.
[3] "Diagnostic impression is agitated depression.

It is my opinion that this individual has shown marked improvement since my last examination, despite the presence of her anxiety and depression. I feel she has a rational and factual understanding of the proceedings against her and has capacity to properly aid counsel in the preparation of her defense to stand trial. Despite the outcome of the case, she will need continuing psychiatric care. Such care can be rendered on an outpatient basis." Report of Dr. Charles B. Mutter, dated August 22, 1977.
"Mrs. Green still shows evidence of significant depressive thinking. The depressive ideation does not seem to be as broad in terms of its effects on the total functioning of her personality. However, at times the depth of her depression may be just as great as previously. Her ideation is still somewhat morbid and there are numerous statements relating to matters of death. Nevertheless, her depression does not presently seem to be of psychotic proportions and it is my opinion that the client is presently able to assist counsel in her defense and understand the nature of the charges against her. It is felt that she presently possesses a rational and factual understanding of the charges and based upon the quality of her communication with me, it is my opinion that she can communicate with counsel with a reasonable degree of rational understanding. There is, of course, the possibility that her condition may continue to improve over subsequent months and she may be even better able to assist counsel in the future." Report of Dr. Sanford Jacobson, dated September 20, 1977.
"I believe she shows some improvement from her previous condition as noted in the first examination. The medication she is taking now is a milder type and may indeed be indicative of her improvement. She continues to show some symptoms of anxiety and concern, some related to her realistic problems both in terms of her marriage as well as her legal situation. I believe she is presently capable of properly answering the charges against her and aid in her own defense and stand trial. As noted in my previous examination I felt that she was able to distinguish between right and wrong and to know the nature and consequences of her acts, but that her developing mental illness had interfered with her ability to use proper judgment. I feel she should continue to be under psychiatric care, especially in view of her current domestic problems." Report of Dr. William Corwin, dated September 30, 1977.
[4] "The question has been raised whether Mrs. Adelita Green in her trial should be exposed to television coverage. This television coverage being the mode of the court recently might well occur in Mrs. Adelita Green's case and I would strongly urge and recommend that it be avoided at all costs.

As you know, Mrs. Green is of Oriental background and the whole situation of saving face and of not being ashamed or belittled before her friends and family has been a serious problem in her life and in the management of her condition. Part of this, of course, is the fact that Mrs. Green has just recently recovered from a psychotic state and, although she is much better, inordinate stresses should be avoided at all costs in order to prevent possible breakdown into the psychotic depression that she has just recently been liberated from.
When we consider these two factors alone, there certainly is enough indication that exposure to the television cameras, let alone exposure to the community, would indeed be a cruel and inhuman treatment and would, in all probabilities, create a rather difficult situation that would lead to a psychotic breakdown which we are desperately trying to avoid at all costs.
In addition to all these factors, Mrs. Green has been instructed not to appear in court whenever possible in the recent past since she has not been able to tolerate anxiety too well and we have avoided, as you know, any anxiety provoking situations. It will be difficult enough in the ordinary trial situation for her to be able to withstand the anxieties that are attendant to her appearance so that additional burdens such as having to be concerned about her television situation will only complicate an already difficult situation. At any rate, in conclusion I must seriously object to any factors that will produce unnecessary stress in Mrs. Green's case since maintaining her at a stabilized level is difficult at best and, should additional stresses be added, it can only undo much of the work that we have been able to accomplish in these past eight months. I would like to advise you that to have brought her from the purely psychotic state she was in to the more stabilized state she now represents in eight months has been a rather heroic task and I would not like to see it undone by factors which are extraneous and which are unnecessary." Report of Dr. Arthur Stillman, dated October 3, 1977.
[5] The subpoena duces tecum called on Mr. Chin to produce at trial the following documents:

"1. U.S. Income tax returns for 1974, 1975 and 1976.
2. United States Customs Declarations for importation of cash.
3. All records of bank accounts held in England, the United States, Jamaica, and any other country.
4. All correspondence between you and ADELITA GREEN.
5. All agreements prepared for you by ADELITA GREEN.
6. Evidence of ownership of all property you own either legally or equitably including but not limited to the U.S. and Jamaica.
7. Your passport.
8. All papers filed by you or on your behalf with the Immigration and Naturalization Service of the United States.
9. All documents showing income taxes paid by you in Jamaica.
10. All documents showing permission to export American dollars from Jamaica.
11. Records of all indebtedness owed to you; i.e., Certificates of Deposit, loans, investments, mortgages, etc.
12. All your business records relating to your present business."