[No. 49104-6. En Banc. March 22, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. MAYMERUTH COE, *Defendant,* KHQ, INC., *Appellant.*

*Witherspoon, Kelley, Davenport & Toole, P.S.,* by *Duane M. Swinton* and *E. Glenn Harmon,* for appellant.

*Carl Maxey* and *George D. Conrad,* for respondent.

*P. Cameron DeVore* and *Daniel M. Waggoner* on behalf of Allied Daily Newspapers and *Floyd Abrams* and *Stephen E. De Forest* on behalf of National Broadcasting Company, National Association of Broadcasters, Radio–Television News Directors Association, and Reporters Committee for Freedom of the Press, amici curiae for appellant.

*Fredric C. Tausend,* amicus curiae for respondent.

UTTER, J.—The trial court held a radio and television station in contempt for violating a court order prohibiting the broadcast of accurate, lawfully obtained copies of tape recordings that had been played in open court. We hold that such an order is void under the free speech and press provisions of the Washington and United States Constitutions, and therefore reverse the conviction.

I

MaymeRuth Coe (Coe) was on trial from May 17 to 25, 1982, in Spokane County Superior Court on a charge of solicitation of murder. She was accused of attempting to hire an undercover police officer to murder the prosecutor and judge who had previously tried and convicted her son,

Fred Coe, of a series of rapes. Both the rape trial and the murder solicitation trial were very highly publicized.

The case was tried without a jury. Coe's defenses included entrapment and diminished mental capacity at the time she solicited the murders. Among the most important evidence against Coe were tape recordings of her meetings and telephone conversations with the undercover police officer.

On the second day of trial (May 18) a reporter for appellant KHQ, Inc. (KHQ), a Spokane radio and television station, asked the prosecutor for a copy of the tape recordings, which had already been admitted into evidence. The prosecutor obliged on the condition that the tapes not be aired before they were played in open court. KHQ complied with this condition.

Later on May 18, Coe's attorney asked the trial court to withhold the tapes from the news media. The trial judge orally ordered KHQ not to air the tapes. A hearing on the issue was scheduled for 4 p.m. the next day, May 19. Meanwhile, on the afternoon of May 18, the recordings were played in open court. Coe received permission to leave the packed courtroom while the tapes were being played. Transcripts of the recordings were released to the news media the same day, and were printed virtually in their entirety in the May 19 editions of Spokane's daily newspapers.

At the May 19 hearing, Coe's attorney, Carl Maxey, presented an affidavit from two psychologists who had been retained as defense witnesses. The affidavit described Coe's treatment for psychological problems, including "manic–depressive psychosis" and "suicide ideation." It stated:

> In essence the tapes made public would be direct opposition to both the short and long term treatment goals and would facilitate a full–blown psychotic break.
>
> . . .
>
> If the tapes were to be given for general access by the media and the public, not only would it be probable for Ruth to undergo remission, playing of the tapes would exascerbate [sic] her psychosis resulting in a high poten-

tial for suicide. The tapes made public would in fact, literally destroy her. Suicide and/or a major psychotic break with reality would be her only remaining defense mechanisms. If suicide was attempted but not completed, irreparable damage would occur; therefore in consideration of the above, we strongly believe that the tapes should not be made public.

Clerk's Papers, at 57–58.

At 9 a.m. the next morning, May 20, the judge announced in open court that the order would remain in effect indefinitely pending the news media's production of affidavits or other expert opinions to refute the opinions of Coe's psychologists.

Later that afternoon, attorneys for Coe and KHQ met with the judge in chambers. In his oral decision, the judge said of that meeting:

[KHQ's attorneys] requested the right to either have an examination of the Defendant by some psychologist or psychiatrist of their choosing or be given the opportunity to cross–examine the two psychologists. Mr. Maxey declined to permit that, and I declined, at least at that time to lift the ban. And we sort of left the thing on hold.

Verbatim Report of Proceedings, vol. 4, at 3. Counsel for KHQ added that Mr. Maxey had declared his willingness to be held in contempt rather than permit the psychologists to be examined.

At or shortly after that discussion, KHQ's attorney presented the judge with a brief proposed order prohibiting the broadcast of the tapes. The written order, like the oral order then in effect, contained no express temporal or geographic limits. The judge signed the order to provide KHQ a written basis for appeal, adding in his own handwriting that it was "based on the allegations stated in the affidavits of the two psychologists filed by Def[endant]." In his later oral opinion, the judge added that he also considered prior testimony about Coe's long–standing psychiatric problems.

Beginning at noon on Friday, May 21, following presentation of a motion to reconsider the written order, KHQ broadcast excerpts of the tape recordings on its radio and

television stations.[1] That same Friday afternoon, Coe learned that the tapes had been broadcast, and suffered some kind of "collapse" that led her to check into a hospital psychiatric ward for the weekend. The trial was continued until Monday, resulting in a half–day delay.

In response to a motion by Coe's attorney, the judge issued an order to show cause why KHQ should not be held in civil contempt under RCW 7.20 and the inherent power of the court.

At the May 26 show cause hearing, KHQ was found in contempt of court. The judge said in his oral decision that "I expressed some skepticism [at the May 19 hearing] as to whether or not this one additional traumatic event, that is, of the rebroadcast over the media of the tapes themselves, would be sufficient to change her psychiatric situation all that much", and "I felt some skepticism about the validity or soundness of the [psychologists'] opinion . . ." Verbatim Report of Proceedings, vol. 4, at 2, 7. He also expressed some uncertainty about the legality of the order.

On May 28, Coe was found guilty of solicitation of murder.

On September 1, 1982, a memorandum decision holding KHQ in contempt was entered. The memorandum decision contained a number of important findings and statements. First, the judge found that KHQ had lawful physical possession of the tapes prior to any court order regarding their broadcast. Second, he found that although the news media's First Amendment right to broadcast the tapes was not absolute, their limited right was not satisfied by the publication of the tapes in print or by oral repetition. Third, the judge declared that "[t]his is truly a 'prior restraint' case." Clerk's Papers, at 85. Fourth, he stated:

Defendant argues that her right to a fair trial was in

---

[1] In the broadcast excerpts, Coe told the undercover police officer that she wanted the judge and prosecutor killed, and that although she didn't have much money to pay for the job, it was a job that would "help humanity." She also asked if the deaths could be made to look like heart attacks to divert suspicion from her family.

jeopardy because of the likelihood that the broadcast of the tapes would cause her such severe mental or emotional distress as to prevent her from continuing with the trial. I did not base my order on this contention, however, for the reason that the trial being before the court without a jury, a brief interruption of the trial, as actually did occur, was not in my view a sufficiently grave consequence in and of itself to justify the prior restraint order . . .

Clerk's Papers, at 85. Fifth, the judge stated that the order was actually based on the need to protect Coe's rights to life and sanity, which he found to be impliedly protected as rights "retained by the people" under the ninth amendment to the United States Constitution. Sixth, he reiterated that he had been "openly skeptical of the opinion that rebroadcast of the tapes would be the straw that broke the camel's back for Mrs. Coe . . ." Clerk's Papers, at 87. Seventh, the judge "concede[d] that KHQ was placed in an awkward position because it claimed an inability to refute the affidavits of [the psychologists] for the reason that the experts it had apparently consulted would not express an opinion without examining the defendant. . . . I had no reason to doubt it . . ." Clerk's Papers, at 88. Finally, the judge stated that the "order was and is of honestly debatable constitutionality". Clerk's Papers, at 91. He nevertheless imposed a fine of $2,000.

KHQ appeals the contempt judgment on the ground that the order restraining broadcast of the tapes was constitutionally invalid for a number of reasons, and therefore a contempt conviction could not be based on its violation. Respondent replies that the order was constitutionally valid, and that even if it were not, it would not relieve KHQ of the consequences of deliberately disobeying a court order.

## II

The first issue is whether the alleged invalidity of the underlying order would vitiate the contempt judgment.

Our "collateral bar" rule states that a court order

cannot be collaterally attacked in contempt proceedings arising from its violation, since a contempt judgment will normally stand even if the order violated was erroneous or was later ruled invalid. *See, e.g., Mead Sch. Dist. 354 v. Mead Educ. Ass'n,* 85 Wn.2d 278, 280–84, 534 P.2d 561 (1975); *Walker v. Birmingham,* 388 U.S. 307, 18 L. Ed. 2d 1210, 87 S. Ct. 1824 (1967). However, we have long recognized at least one exception: a contempt conviction will fall if the underlying order was not within "the scope of the jurisdiction of the issuing court." *Mead,* at 280. After reviewing the Washington cases reversing contempt convictions on various grounds relating to the invalidity of the order violated, the *Mead* court explained that

> [t]he "jurisdiction" test measures whether a court, in issuing an order or holding in contempt those who defy it, was performing the sort of function for which judicial power was vested in it. If, but only if, it was not, its process is not entitled to the respect due that of a lawful judicial body. "Only when a court is so obviously traveling outside its orbit as to be merely usurping judicial forms and facilities, may [its order] be disobeyed . . ."

*Mead,* at 282. The contempt order is therefore vitiated where there is "an absence of jurisdiction to issue the type of order, to address the subject matter, or to bind the defendant . . ." *Mead,* at 284. In *Bresolin v. Morris,* 86 Wn.2d 241, 245, 543 P.2d 325 (1975), we stated that "[a] judgment is void only where the court lacks jurisdiction of the parties or the subject matter or lacks the inherent power to enter the particular order involved." Since *Mead* involved only a technical jurisdictional problem (the plaintiff's attorneys were authorized to file the action by an invalid resolution of the board of directors), the court upheld the contempt conviction. *Mead,* at 283, 288.

A case we relied on in *Mead* to deduce the scope of the jurisdiction test was *State ex rel. Superior Court v. Sperry,* 79 Wn.2d 69, 483 P.2d 608, *cert. denied,* 404 U.S. 939 (1971). In *Mead* we characterized *Sperry* as a case "where the order itself was not one the court was authorized to

issue", and was therefore a "serious and obvious usurpation of power by the offended court." *Mead,* at 281. In *Sperry,* the trial judge in a highly publicized murder case, after agreeing with the attorneys that the jury need not be sequestered, issued an order prohibiting the news media from reporting "matters or testimony ruled inadmissible or stricken by the trial judge . . ." *Sperry,* at 70. During the trial, the Seattle Times published inadmissible evidence which had been presented to the judge in open court out of the presence of the jury, resulting in a contempt judgment. This court began its review of the contempt judgment by holding that the appellants were not required to attack the order by direct appeal:

> The [collateral bar] rule of *Walker* is inapposite here. There the order was not patently invalid, as compared to the order challenged here which is void on its face, as later in this opinion explained. We have held in a number of cases that a void order or decree, as distinguished from one that is merely erroneous, may be attacked in a collateral proceeding. . . . The violation of an order patently in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt. . . .
>
> The "collateral bar" rule which the state contends to be enunciated in *Walker* has justifiably been subjected to much legal criticism, particularly as it applies to free speech cases. Frequently an injunction issues immediately before the planned activity is to occur and there is then no time available to the enjoined party to make a direct attack upon the injunction. The practical result then is that the enjoined party has no adequate remedy at law and cannot engage in a lawful activity because of an unconstitutional order. To us "It . . . seems unlikely that allowing collateral attack would significantly reduce citizen compliance with lawful decrees; the citizen still faces a substantial risk of criminal penalties if proved wrong in collateral, rather than direct, attack on the decree's validity." . . .
>
> Additionally, it is likely that we would have declined to review the October 8, 1970 order by direct appeal or review.

*Sperry,* at 74.[2]

Under Washington law, if the order in this case was patently invalid or "void" as outside the court's power, the contempt judgment against KHQ must be reversed.[3]

## III

The trial judge found that "this is truly a 'prior restraint' case," and all of the parties and amici seem to agree. The order in this case does fit neatly within the definition of prior restraints, which are "official restrictions imposed upon speech or other forms of expression in advance of actual publication." *Seattle v. Bittner,* 81 Wn.2d 747, 756, 505 P.2d 126 (1973) (quoting Emerson, *The Doctrine of Prior Restraint,* 20 Law & Contemp. Probs. 648 (1955)). *See also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 556, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976), where "prior restraints" are defined as "orders that prohibit the publication or broadcast of particular information or commentary . . ."

Although prior restraints are presumptively unconstitutional, *see, e.g., Sperry,* at 76, not all prior restraints are

---

[2]The parties disagree as to whether KHQ, which was not a party to the criminal action against Coe, had standing to appeal the order directly. *See, e.g., State v. Bianchi,* 92 Wn.2d 91, 93, 593 P.2d 1330 (1979), where a unanimous court held that the only proper forum for a newspaper to challenge a court order limiting access to documents in a criminal trial was a separate action for declaratory judgment, mandamus or prohibition. It is not necessary to decide this issue, however, since whatever direct remedies KHQ may have had would have been ineffective. The Court of Appeals could not have heard KHQ's motion for discretionary review and expedited hearing until after the testimony of all the witnesses had been completed, by which time most of the news value of airing the tapes would have disappeared. Furthermore, review by the Court of Appeals would have been discretionary, and that court may well have declined review.

[3]Respondent and amicus rely on *Walker, United States v. Dickinson,* 465 F.2d 496 (5th Cir. 1972), *aff'd after remand,* 476 F.2d 373, *cert. denied,* 414 U.S. 979 (1973) (relying on *Walker*), cases from other jurisdictions and *Mead* to argue that the *Sperry* rule is incorrect or inapplicable. *Walker* and *Dickinson* represent the federal rule, which was distinguished and disapproved as a matter of state law by this court in *Sperry. Mead* clarifies *Sperry* and harmonizes it with other cases rather than overruling it.

prohibited. Federal law has long recognized the validity of some prior restraints on constitutionally unprotected speech, such as obscenity and incitement to acts of violence, and on speech that directly threatens military security. *See Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 716, 75 L. Ed. 1357, 51 S. Ct. 625 (1931). *See also Seattle v. Bittner, supra* at 757 (some prior restraints on obscenity valid). In addition, a regulation may not rise to the level of a prior restraint if it is merely a valid time, place or manner restriction on the exercise of protected speech. Since the trial court's order contained no temporal or geographic limits, it cannot be characterized as a time or place restriction. Nor did it constitute a valid "manner" restriction on the loudness of speech (*e.g.,* the use of sound trucks or loud shouting designed to disrupt rather than communicate) or on the use of house to house solicitation or canvassing.[4]

The order in this case constitutes a classic prior restraint. *See also Smith v. Daily Mail Pub'g Co.,* 443 U.S. 97, 103, 61 L. Ed. 2d 399, 99 S. Ct. 2667 (1979).

IV

Whether the prior restraint was constitutionally valid or invalid should be treated first under our state constitution, for a number of reasons. First, state courts have a duty to independently interpret and apply their state constitutions that stems from the very nature of our federal system and the vast differences between the federal and state constitu-

---

[4]We are not inclined to break new legal ground and hold, without any supporting authority, that prohibiting broadcast of the tapes themselves while allowing their written publication or televised performance by actors constituted a new type of "manner" restriction, especially where, as here, the tapes themselves contained inflections of voice and speech patterns that were uniquely relevant to Coe's defenses of diminished mental capacity and entrapment and could not have been adequately communicated to the public by alternative means. Thus, the trial judge was correct when he ruled that KHQ's free speech rights were not satisfied by allowing publication of the tapes in print or by oral repetition. *Cf. In re NBC,* 635 F.2d 945, 952 (2d Cir. 1980), where the Court of Appeals ruled that, except in the most extraordinary circumstances, the press had a right to inspect and copy the ABSCAM tapes showing members of Congress taking bribes from undercover FBI agents, once the tapes had been admitted into evidence.

tions and courts. Second, the histories of the United States and Washington Constitutions clearly demonstrate that the protection of the fundamental rights of Washington citizens was intended to be and remains a separate and important function of our state constitution and courts that is closely associated with our sovereignty. By turning to our own constitution first we grant the proper respect to our own legal foundations and fulfill our sovereign duties. Third, by turning first to our own constitution we can develop a body of independent jurisprudence that will assist this court and the bar of our state in understanding how that constitution will be applied. Fourth, we will be able to assist other states that have similar constitutional provisions develop a principled, responsible body of law that will not appear to have been constructed to meet the whim of the moment. Finally, to apply the federal constitution before the Washington Constitution would be as improper and premature as deciding a case on state constitutional grounds when statutory grounds would have sufficed, and for essentially the same reasons.

The question remains whether, under the Washington Constitution, the trial court's prior restraint order was patently invalid or void. We hold that it was.

Prior restraints on speech and press are governed by article 1, section 5 of the Washington Constitution, which states:

> Freedom of Speech. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

Appellant correctly points out that, unlike the first amendment to the United States Constitution, the plain language of Const. art. 1, § 5 seems to rule out prior restraints under *any* circumstances, leaving the State with only post–publication sanctions to punish abuse of free speech rights. Three Justices expressly adopted this interpretation of Const. art. 1, § 5 in a special concurrence in *State ex rel. Superior Court v. Sperry,* 79 Wn.2d 69, 101–03, 483 P.2d 608, *cert. denied,* 404 U.S. 939 (1971). *Cf.*

*State v. Fox,* 71 Wash. 185, 186, 127 P. 1111 (1912), *aff'd,* 236 U.S. 273, 59 L. Ed. 573, 35 S. Ct. 383 (1915). Such an approach would be consistent with our recent ruling that under Const. art. 1, § 5, free speech is a "preferred right" when balanced against other constitutional rights. *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 244, 635 P.2d 108 (1981) (citing *Marsh v. Alabama,* 326 U.S. 501, 509, 90 L. Ed. 265, 66 S. Ct. 276 (1946)). However, we have expressly rejected an absolute bar against prior restraints on speech which is *not* constitutionally protected. *Seattle v. Bittner, supra* at 757 (obscenity); *Fine Arts Guild, Inc. v. Seattle,* 74 Wn.2d 503, 512–13, 445 P.2d 602 (1968) (obscenity).

■ The language of the Washington Constitution absolutely forbids prior restraints against the publication or broadcast of constitutionally protected speech under the facts of this case, since the information sought to be restrained was lawfully obtained, true, and a matter of public record by virtue of having been previously admitted into evidence and presented in open court.

*Sperry* provides only ambiguous guidance regarding the scope of our free speech provision's protection against prior restraints. While we purported to base our application of a balancing test in that case on both the state and federal constitutions, the court there failed to distinguish between the two documents, and in fact referred only to the United States Constitution when announcing the relevant rule and summarizing the holding. *Sperry,* at 75–76, 78. This is probably why our subsequent opinion in *State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973), the criminal case that gave rise to the order struck down in *Sperry,* describes *Sperry* as "holding that the order *violated the first amendment to the United States Constitution."* (Italics ours.) *Braun,* at 168 n.9. On the other hand, we have also interpreted *Sperry* as establishing an apparently unqualified right under Const. art. 1, § 5 to publish information lawfully gathered at public court proceedings. *See Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 58, 63, 615 P.2d 440

(1980).

There is ample support for the approach suggested in *Federated Publications* in the cases of other jurisdictions with constitutional provisions similar or identical to Const. art. 1, § 5. In *Dailey v. Superior Court,* 112 Cal. 94, 44 P. 458 (1896), a trial court ordered the petitioner not to advertise or perform a play based on the facts of a pending murder case as established at the preliminary examination and coroner's inquest. The order reflected the court's concern, based on the defendant's affidavit, that the advertising and production of the play while the jury was being impaneled and the trial conducted might deprive the defendant of a fair and impartial trial. Petitioner violated the order and was convicted of contempt.

The California Supreme Court began its review of the order by stating:

> [T]his case now stands before us exactly as though one of the daily journals was threatening to publish its sentiments pertaining to the conduct of a criminal trial then pending, and the court where such trial was pending and in progress, believing such publication would interfere with the due administration of justice, had issued an order restraining and prohibiting the threatened action of the paper.
>
> We are entirely clear that the court had no jurisdiction to make the order which forms the basis of this proceeding, for such order was an attempted infringement upon rights guaranteed to every citizen by section 9, article I, of the constitution of this state. That section provides: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed. . . . It is patent that this right to speak, write, and publish, cannot be abused until it is exercised, and before it is exercised there can be no responsibility. The purpose of this provision of the constitution was the abolishment of censorship, and for courts to act as censors is directly violative of that purpose.

112 Cal. at 97. The California court held that its free speech provision was broader and conferred greater liberty than the corresponding provisions of the United States and many state constitutions, and concluded

> that the order made by the trial court was an attempted restraint upon the right of free speech, as guaranteed by the constitution of this state, and that petitioner's mouth could not be closed in advance for the purpose of preventing an utterance of his sentiments, however mischievous the prospective results of such utterance. He had the right of free speech, but at all times was responsible to the law for an abuse of that right.
>
> For the foregoing reasons the order is annulled, as being beyond the power of the court to make.

112 Cal. at 100. The California Supreme Court's 19th–century interpretation of the free speech provision of the California Constitution of 1879 is particularly apposite here because Const. art. 1, § 5 was modeled after the California provision. Beardsley, *Notes on the Sources of the Washington Constitution, 1889–1939, reprinted in Constitution of the State of Washington,* app. at 4, 6 (1939); *Alderwood,* at 240–41.

Article 2, section 6 of the Arizona Constitution of 1910, enacted after ours, is identical to Washington's free speech provision. In *Phoenix Newspapers, Inc. v. Superior Court,* 101 Ariz. 257, 418 P.2d 594 (1966), a trial judge complied with defense counsel's oral request to order the press representatives attending a public habeas corpus hearing not to publish what occurred at the hearing. The order was based on the judge's and defense attorney's concern that the jury, which had not yet been selected, might be prejudiced by hearing that the judge had found probable cause to try the defendant for murder. Two newspapers nevertheless published factual accounts of the habeas corpus hearing, and were ordered to appear and show cause why they should not be held in contempt. The newspapers then initiated an action to prohibit the show cause hearing. The Arizona Supreme Court found that the free speech provision of the Arizona Constitution prohibited such an order,

citing *Dailey v. Superior Court, supra,* and cases construing a similar provision of the Texas Constitution, as support for its holding that

> the court could not, in advance of publication, limit the right of petitioners to print the news and inform the public of that which had transpired in open court in the course of a judicial hearing. The order prohibiting publication and discussion in this case is violative of Article 2, § 6 of the Arizona Constitution and is void.

101 Ariz. at 260.

The reasoning of the California and Arizona Supreme Courts in interpreting identical or nearly identical provisions of their own constitutions is persuasive. It gives support for our own independent conclusion that Const. art. 1, § 5 guarantees an absolute right to publish and broadcast accurate, lawfully obtained information that is a matter of public record by virtue of having been admitted into evidence and presented in open court. To the extent that any of the language in *Sperry* suggests that this right is not absolute, it is modified to conform with this opinion.

## V

Although our decision in this case rests on "bona fide separate, adequate, and independent [state constitutional] grounds," *Michigan v. Long,* ___ U.S. ___, 77 L. Ed. 2d 1201, 103 S. Ct. 3469, 3476 (1983), and it is therefore unnecessary for us to reach the federal constitutional issues raised by the parties, we will discuss the potential federal constitutional problems as well for two reasons. First, our reasoning may be of aid to other courts with similar problems who do not have state constitutional provisions similar to ours and must rely on the appropriate federal constitutional provisions and decisions. Second, although the federal cases in no way influenced our decision under the Washington Constitution, such a discussion demonstrates that federal constitutional law also forbids a court to impose prior restraints on the publication of information lawfully obtained at public court proceedings.

In *Oklahoma Pub'g Co. v. District Court,* 430 U.S. 308,

51 L. Ed. 2d 355, 97 S. Ct. 1045 (1977), an 11–year–old boy appeared at a public detention hearing on charges of second degree murder. Reporters learned the juvenile's name at the hearing, and took a photograph of him as he was leaving the courthouse. Thereafter, the juvenile's name and image appeared in newspapers and were broadcast on television and radio. Five days later, the juvenile was arraigned at a closed hearing, at which the judge entered a pretrial order enjoining publication of the name and picture in reliance on state statutes providing that juvenile proceedings and records are closed to the public unless the court orders otherwise. The news media violated the order and sought writs of prohibition and mandamus challenging the order as a prior restraint in violation of the first and fourteenth amendments to the United States Constitution. On appeal from the state supreme court's denial of the writs, the United States Supreme Court stated that its recent decisions in *Nebraska Press Ass'n v. Stuart, supra,* and *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975) compelled it to hold that "the First and Fourteenth Amendments will not permit a state court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact open to the public." 430 U.S. at 310. A relevant factor was that the name and photograph were obtained lawfully. 430 U.S. at 311.

In *Cox Broadcasting,* a television reporter learned the identity of a rape victim by asking the trial court clerk during a recess in proceedings against the alleged rapists for copies of the indictments. There was no contention that the name of the victim was obtained in an improper fashion or that the indictments were not official court documents open to public inspection. After the victim's name was broadcast, the victim's father sued the television station for invasion of privacy, relying on a state statute that made it a misdemeanor to publish or broadcast the name of a rape victim. The state courts upheld the father's right to sue for damages. The United States Supreme Court

reversed, holding:

> We are reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man. Such a rule would make it very difficult for the media to inform citizens about the public business and yet stay within the law. . . . At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records. If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. . . . Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.

420 U.S. at 496.

In *Nebraska Press Ass'n,* the United States Supreme Court held unconstitutional an order prohibiting the press from publishing, among other things, information concerning a confession made by a criminal defendant in a highly publicized murder trial which was discussed at a public preliminary hearing. The order was designed to protect the fair trial rights of the defendant and expired by its own terms when the jury was impaneled. Although some of the Justices thought that closure of the preliminary hearing was a legitimate means of controlling pretrial publicity, all nine Justices agreed that "once a public hearing had been held, what transpired there could not be subject to prior restraint." 427 U.S. at 568 (majority); *see also* 427 U.S. at 596–98 (Brennan, J., concurring).

These cases make it clear the United States Constitution also prohibits prior restraints against publication or broadcast of information lawfully obtained from public court records or proceedings.

> A trial is a public event. What transpires in the court room is public property. . . . Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as

distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it. *Craig v. Harney,* 331 U.S. 367, 374, 91 L. Ed. 1546, 67 S. Ct. 1249 (1947). *See also Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966); *Estes v. Texas,* 381 U.S. 532, 541–42, 14 L. Ed. 2d 543, 85 S. Ct. 1628, *reh'g denied,* 382 U.S. 875 (1965).

"In view of the *Nebraska Press Association, Oklahoma Publishing,* and *Cox Broadcasting* cases, it would seem that a gag order forbidding publication of material disclosed in open court is 'transparently invalid' or has 'only a frivolous pretense to validity.'" Barnett, *The Puzzle of Prior Restraint,* 29 Stan. L. Rev. 539, 555 (1977). Barnett adds, at page 555, that "it should follow that the collateral bar rule may not constitutionally be applied to prevent a publisher from relying on the constitutional infirmities of such an order as a defense to a charge of contempt for having published in the face of it."

## VI

Coe contends that under *Nebraska Press Ass'n,* the affidavit of the two psychologists and evidence concerning Coe's mental state were sufficient to show a danger to her fair trial or other constitutional rights and mandate a balancing of the allegedly endangered rights against the free speech and press rights asserted by KHQ. As we have noted, such balancing is not appropriate in this case because the right of the press to broadcast accurate, lawfully obtained copies of tapes previously played in open court is absolute.[5]

Even if the exercise of such a free speech right were subject to balancing, however, Coe has failed to meet her heavy

---

[5]This decision makes it unnecessary for us to decide many of the issues raised by the parties, including whether the trial court had the power to impose a $2,000 fine on KHQ, whether the oral or written orders were void for vagueness or overbreadth, and whether the *Nebraska Press Ass'n* balancing test, had it been appropriate and properly invoked, should lead to the imposition of a valid prior restraint under the facts of this case.

burden of showing any danger to competing constitutional rights to justify such a prior restraint. At most, the affidavit of the psychologists constituted a weak showing that there was some possibility of a delay in the trial or, perhaps, Coe's death. The trial judge himself was "openly skeptical" of the psychologists' opinion, and expressly refused to base his order on the fair trial issue since he concluded, as we do, that the possibility of a brief delay in a bench trial did not in and of itself jeopardize Coe's fair trial rights. Furthermore, the refusal of Coe's attorney to allow KHQ's attorneys to either cross-examine the psychologists or to have a mental health professional of KHQ's choosing examine Coe deprived KHQ and the trial court of the very information necessary to determine whether Coe's life or sanity were in fact threatened. Such a posture by defense counsel, when sustained by the trial court, makes a mockery of the "heavy presumption of unconstitutionality" of prior restraints and the moving party's "heavy burden of showing justification" for such restraints. *Nebraska Press Ass'n,* at 558; *State ex rel. Superior Court v. Sperry,* 79 Wn.2d 69, 76, 483 P.2d 608, *cert. denied,* 404 U.S. 939 (1971). In effect, the trial court accepted the most superficial showing of justification and then shifted to KHQ the burden of proving that the prior restraint was *not* necessary, all while depriving it of the most appropriate, and perhaps the only, means of meeting that burden. The shifting of the burden of proof under any circumstances, let alone on a superficial showing of danger to somewhat questionable constitutional rights, is inappropriate.[6] As we noted in *Sperry,* "[t]o sustain this judgment of contempt would be to say that the mere possibility of [prejudice to the defendant's rights] is more

---

[6]Respondent has not presented sufficient authority or arguments for us to decide whether the right to life and sanity are rights "retained by the people" under U.S. Const. amend. 9, or Const. art. 1, § 30, or are protected by the due process clauses of the state and federal constitutions, or that Coe would be deprived of those rights or her fair trial rights by state action should a report by a private news agency result in her insanity or lead her to take her own life. Since it is not necessary to address these issues here, we express no opinion on them.

important in the eyes of the law than is a constitutionally guaranteed freedom of expression. This we cannot say." *Sperry*, at 78.

Coe and amicus also argue, apparently in the alternative, that "the niceties of *Nebraska Press*" are not applicable when the alleged threat arises in the middle of trial, or when the press was free to publish the "substance" of the tapes. Regarding the first contention, we believe that an order which would otherwise be invalid cannot be sustained merely because the trial judge and counsel were pressed for time. In such situations, the heavy presumption of unconstitutionality requires a judge to resolve all doubts against prior restraint and to deny requests for such orders. This is especially true where, as in this case, "the judge could not possibly have known whether restraining broadcast of the tapes was strictly and inescapably necessary." Brief of Amicus Tausend, at 20. Regarding the second contention, we have already noted that the inflections of voice recorded on the tapes themselves constituted substantive information which could not be adequately communicated to the public through the publication of cold transcripts or their reading by actors. Since such information was highly relevant to Coe's two major defenses, broadcasting the tapes served a far greater public interest than mere drama or entertainment.

## VII

While we are concerned for the defendant's right to a fair trial, it is our belief that there are numerous adequate and constitutionally permissible methods for trial courts to fulfill their fundamental obligation to protect such rights. Our holding today that prior restraint of certain speech, like secret "star chamber" trials and mandatory submission of advance newspaper copy for court approval, is among the long list of tools that are not constitutionally available to courts to protect defendants' rights in no way reduces the trial courts' responsibilities in this regard.

In *Sheppard v. Maxwell, supra,* the United States

Supreme Court reversed a murder conviction because massive and pervasive publicity had deprived the defendant of a fair trial. The Court suggested a number of steps that the trial judge could have taken to protect the defendant from the effects of such publicity, including continuing the case until the threat abated, changing venue, sequestering the jury, proscribing public statements by prosecutors, attorneys, witnesses, court staff, police and the defendant, limiting the number of reporters permitted in the courtroom and more closely regulating their conduct therein, and ordering a new trial. *Sheppard,* at 358, 363. The Court has also pointed to the use of voir dire and jury instructions to protect defendants' rights. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 564, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976). Although not all of these measures would be appropriate or effective in any given case, they illustrate the broad range of tools that the federal courts have found permitted under the United States Constitution to protect defendants' rights from impairment by excessive or biased publicity. The validity of these approaches under the Washington Constitution was not presented to the court. Among the available tools not adequately discussed in *Sheppard* or *Nebraska Press Ass'n* are restrictions on press *access* to certain types of judicial proceedings, information or records, when circumstances so warrant.[7]

This partial list of a trial court's powers is not meant to suggest that courts are responsible for the protection of all of a defendant's rights in all circumstances. Sometimes that responsibility must rest with other officials who have also sworn to uphold the constitution, and even with interested private parties. In a recent case involving the closure of a pretrial hearing in part to protect allegedly endangered witnesses, Justice Dolliver wrote:

---

[7]We express no opinion on whether such restrictions would have been appropriate at any stage in this case. *See generally Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 640 P.2d 716 (1982); *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980).

It is not the business of courts through pretrial secrecy orders to provide "protection" for witnesses or parties. To hold otherwise would put the courts in an impossible position: Fail to issue a secrecy order and if the witness or party is injured or killed it is the fault of the court.

The safety or life of a witness or a party to an action is the responsibility of law enforcement agencies. It is not properly done by courts through the use of secrecy orders. Once the argument to the contrary is accepted, any vitality in an open judicial system is destroyed.

If the unavoidable circumstances are indeed such that a witness or a party to an action must be protected, then this must be accomplished by appropriate police action and not by the closure of the court.

*Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 46, 640 P.2d 716 (1982) (Dolliver, J., concurring). Such an allocation of responsibilities is especially appropriate in cases like the one at bar, where primary responsibility for the defendant's mental health rests with the defendant and her physicians, psychiatrists, attorneys and family. When those persons are unable to adequately protect her, the courts, the police, and various specialized public and private agencies provide appropriate procedures and resources for treating seriously disturbed individuals on an emergency basis and protecting them from self–inflicted harm.

Finally, although it is difficult to conceive of a situation where conscientious public officials would be unable to protect a criminal defendant's rights with the tools available, a defendant's fair trial rights can always be vindicated by reversing his or her conviction. Although such a drastic remedy should be used sparingly, an occasional reversal is a small price to pay for preventing "prior restraints on speech and publication [which] are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n,* at 559.

## VIII

For the foregoing reasons, the trial court's judgment of

contempt against appellant KHQ is reversed.

WILLIAMS, C.J., and BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., concur.

ROSELLINI, J. (concurring in part, dissenting in part)— The majority today grants the press and news media an absolute right to publish and broadcast lawfully obtained information. Majority opinion, at 378. Because the notion that any right is absolute conflicts with basic constitutional analysis, delegates, unwisely, judicial responsibility for protecting individual rights and celebrates the rhetoric of prior restraint over the substantive values inherent in First Amendment analysis, I dissent from part IV of the majority opinion.

The majority's assertion that Const. art. 1, § 5 guarantees an absolute right is inconsistent with constitutional analysis from our court. In each of our prior decisions involving confrontation between the press and other constitutional rights, we have recognized the vital need to balance conflicting rights. *See, e.g., Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 640 P.2d 716 (1982) (court must weigh competing interests of defendant and public); *Federated Publications, Inc. v. Swedberg,* 96 Wn.2d 13, 16, 633 P.2d 74 (1981), *cert. denied,* 456 U.S. 984 (1982) (right of access must be balanced against the right of a person accused of a crime to be tried by an impartial jury); *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 64, 615 P.2d 440 (1980) (courts must weigh competing interests). These decisions reflect this court's clear preference for accommodation of conflicting interests. An absolute right to publish permits no accommodation.

The majority justifies its approach on the theory of independent state grounds. The majority asserts that article 1, section 5 grants greater rights to the press under our state constitution than does the First Amendment.

The majority's reliance on the doctrine of independent state grounds is misplaced. Although a state may grant

greater protections under its state provisions, it may not do so if the effect of granting greater protection to one right is to derogate another constitutional right. This elementary fact was recognized in a case relied upon by the majority, *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 243–44, 635 P.2d 108 (1981). There, we observed:

Although we read section 5 and amendment 7 as not requiring the same "state action" as the Fourteenth Amendment, that does not mean those provisions are applicable to all speech and initiative activities. If there were no limitations to their application, every private conflict involving speech and property rights would become a constitutional dispute. Note, *Robins v. Prune-yard Shopping Center: Free Speech Access to Shopping Centers Under the California Constitution*, 68 Cal. L. Rev. 641, 659 (1980). Such an approach would deny private autonomy and property rights in the same way as the "state action" requirement of the Fourteenth Amendment denies free speech. To endorse either approach would ignore the validity of certain constitutional rights and would be inconsistent with the balancing approach generally employed in resolving First Amendment and property rights conflicts.

(Footnote omitted.)

By granting an absolute right to broadcast this information, the majority "ignore[s] the validity" of the defendant's Sixth Amendment rights and the privacy rights of participants in the judicial process. This our court cannot— constitutionally—do. This fact is most obvious in the context of conflicts with Sixth Amendment rights. Of this right, the United States Supreme Court has said: "*No right ranks higher than the right of the accused to a fair trial.*" (Italics mine.) *Press–Enterprise Co. v. Superior Court*, ___ U.S. ___, 78 L. Ed. 2d 629, 104 S. Ct. 819, 823 (1984). The absolutist approach taken by the majority would prevent a trial judge from protecting Sixth Amendment rights, and to that extent our independent state grounds analysis is constitutionally prohibited.

I do not believe, however, that the majority purposefully intends to vitiate Sixth Amendment rights. It is likely that

the majority presumes that broadcast of information already admitted into evidence at trial can never, seriously, prejudice a defendant. I am not so wise nor so willing to assume that we have foreseen all the ways in which evidence may be used or all the consequences of its use.

My uneasiness stems, in part, from the majority's insistence that the press may publish the evidence in *whatever form* it is introduced in trial. Implicit in this holding is the belief that the news media will judiciously utilize the evidence presented in court. Given the potency certain forms of evidence take, I cannot agree with the majority's abrogation of its duty to protect an individual's constitutional rights.

Consider the variety of information introduced in criminal trials. Criminal trials frequently involve the introduction of gruesome or obscene photographs and of taped conversations between participants in criminal activity. These items may not be overly prejudicial. But consider also some of the more dramatic forms evidence may take: the video tapes of rape scenes filmed by sexual psychopaths, the dramatic emergency calls between victims and county dispatchers, and the stark and distressing, but frequently necessary, photographs of an autopsy. All of these items are subject to the rule promulgated by the majority. Yet, the broadcast of any one of these items has the potential for causing irreparable prejudice to a defendant or grievous invasion of a victim's privacy. Nonetheless, the rule suggested by the majority binds the hands of trial judges and leaves them helpless to protect these rights.

Even if we were to assume, as does the majority, that evidence admitted in court cannot be overly prejudicial to a defendant, and even if we were to assume, as the majority must, that the trial court has no obligation to protect the privacy interest of the participants in a trial, we would still be left with a rule that allowed potential infringement upon Sixth Amendment rights. This premise can be demonstrated by examining a news media access case from Florida. *Green v. State,* 377 So. 2d 193 (Fla. Dist. Ct. App.

1979). In *Green,* the defendant established a previous history of incompetency that for 8 months prevented her from being able to stand trial. When, after extensive treatment, she became competent, her lawyer moved to prohibit television coverage of the trial. He argued that the added stress of being belittled not only in court but on television, before her family, friends and the community, would lead to a return of her mental incompetency. Psychiatric testimony was offered, which, if believed, established that television coverage of the event would lead to a psychotic breakdown. The Florida court ruled that the trial court committed reversible error in allowing the news media to broadcast the trial without first conducting an evidentiary hearing. In discussing the effect broadcasting of a trial would have on the defendant, the court observed:

> It also seems clear that the advent of electronic media coverage of a criminal trial carries with it, at times, the risk of rendering a borderline competent defendant incompetent to stand trial and that a case involving such a defendant must be handled with special care by the trial court. A mentally disturbed, but technically competent defendant, like any other defendant, must face a much greater public exposure if his trial is televised. As a result, he is almost certain to suffer a greater level of anxiety than he would if his trial were not televised. This increased anxiety may impair his ability to consult with counsel during trial with a reasonable degree of rational understanding or it may impair his rational as well as factual understanding of the proceedings against him. If either event be the case, the defendant has, in our view, demonstrated prejudice under [*In re Post–Newsweek Stations, Florida, Inc.,* 347 So. 2d 402, 347 So. 2d 404 (Fla. 1977)], so as to exclude electronic media coverage of the judicial proceedings in the case. To rule otherwise would be to sanction the trial of a competent defendant rendered incompetent by electronic media coverage, a result which our law does not and cannot permit.

*Green,* at 200.

Although the present case involves the out–of–court usage of evidence rather than television coverage of the event itself, the Florida court's discussion of the trial

court's duty to protect a borderline competent defendant from unnecessary stress which could return her to a state of incompetency is apropos. This analysis reflects the importance of Sixth Amendment rights in our system of government and coincides with sentiments most recently expressed by the United States Supreme Court. *See Press–Enterprise Co. v. Superior Court, supra.* To protect these rights, we must leave room for the law to develop on a case–by–case basis. Absolute rights permit no such growth.

Finally, the majority's dogmatic prior restraint approach celebrates form over substance, in that it is itself violative of the underlying goal of encouraging free and open communication which inheres in First Amendment analysis. The majority uncritically views the issue as an open and shut prior restraint case. This analysis not only ignores much of the recent criticism of the prior restraint doctrine, *see, e.g.,* Jeffries, *Rethinking Prior Restraint,* 92 Yale L. Rev. 409 (1983); Mayton, *Toward a Theory of First Amendment Process: Injunctions of Speech, Subsequent Punishment, and the Costs of the Prior Restraint Doctrine,* 67 Cornell L. Rev. 245 (1982), it also infringes upon the goal of open communication.

Consider the consequences of the majority's rule. The majority's analysis "guarantees an absolute right" to publish information that is admitted into evidence and presented in open court. Majority opinion, at 378. By its decision to ignore the manner of communication, the court also guarantees the right to broadcast information in the form the information takes in court. Thus, to avoid infringement on a defendant's Sixth Amendment rights or the privacy rights of participants,[8] the court must close the

---

[8]In *Press–Enterprise Co. v. Superior Court,* ___ U.S. ___, 78 L. Ed. 2d 629, 104 S. Ct. 819 (1984), the United States Supreme Court explicitly recognized the importance of these rights. Chief Justice Burger, writing for the majority, observed first that

The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the

courtroom and prohibit access to the information.[9] Such a result is absurd. Lesser remedies, like enjoining broadcast of the tapes, but allowing publication of the transcripts, provide open access to the proceedings and encourages the free exchange of information, while protecting the rights discussed above. *See, e.g.,* Barnett, *The Puzzle of Prior Restraint,* 29 Stan. L. Rev. 539 (1977).

Because I believe that MaymeRuth Coe has not established a substantial infringement on her Sixth Amendment rights, I concur in the result reached by the majority. But because I fear the consequences of any absolute rule, I dissent from part IV of the majority opinion.

DORE, J., and CUNNINGHAM, J. Pro Tem., concur with ROSELLINI, J.

---

public domain.

104 S. Ct. at 825. After discussing the importance of these rights, the Court implicitly condoned limited closure of voir dire to protect those privacy rights. Chief Justice Burger wrote:

When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment.

104 S. Ct. at 825–26.

[9]Unlike the majority, the United States Supreme Court does not view free press rights as absolute. In *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 73 L. Ed. 2d 248, 102 S. Ct. 2613 (1982), Justice Brennan, writing for the majority, highlighted the importance of public trials but warned, "Although the right of access to criminal trials is of constitutional stature, it is not absolute."