[No. 56246–6.   Department One.   December 21, 1989.]

BRIAN HALQUIST, *Petitioner,* v. THE DEPARTMENT OF CORRECTIONS, ET AL, *Respondents.*

*Royce Ferguson,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *Thornton Wilson, Assistant,* for respondents.

PER CURIAM.—Brian Halquist, a journalist and independent producer of radio and television documentaries, asked the Department of Corrections to allow him to videotape the execution of Charles Campbell. When the Department denied his request, Mr. Halquist, hereinafter referred to as petitioner, filed an original action in this court for a writ of mandamus or prohibition. The principal issue raised is whether petitioner has a right under the Washington Constitution to videotape an execution.

Counsel have submitted a joint statement to the court setting forth undisputed facts. The Department of Corrections contends that given these facts, petitioner has no right to relief as a matter of law. We determine that the Department of Corrections' initial pleading can and should be considered as the equivalent of a trial court motion for judgment on the pleadings or for summary judgment. We considered the record and the pleadings at the court's conference of October 31, 1989, and entered an order dismissing the original action. This is the explanatory opinion promised therein. In their joint statement of facts, the parties say the Department of Corrections recognizes that an execution is a newsworthy event and plans to allow 12 members of the press into the execution chamber to witness any execution.[1] Nonetheless, the Department refused the petitioner's request based on Department of Corrections policy 760.001, which sets forth the Department's procedures and policies concerning executions. The parties stipulated that this policy addresses the Department's concerns for:

(a) the privacy of the staff and contracting parties who participate in the execution; (b) security in the penitentiary and execution chamber; (c) the inmate's residual right to privacy; and (d) the location of a video camera during the execution.

Stipulation of Parties, at 4.

The parties agree that the Department "has legitimate concerns for the security of the penitentiary and the confidentiality of those persons who will carry out the execution." Stipulation, at 4.[2] The petitioner agrees to respect the privacy of the staff and contracting parties and allow review of the final video to assure confidentiality. He also offers to submit himself and his equipment to any search or

---

[1] An affidavit from Director of Prisons, Lawrence Kincheloe, makes clear that this "chamber" actually consists of three rooms. One contains the gallows and the trap door to the room below. This lower room also contains the lethal injection table. The third room is as tall as the other two combined and allows witnesses to view the execution through thick Lexan windows opening to the other two rooms.

[2] Director Kincheloe sets forth these concerns in some detail in his affidavit.

examination deemed necessary by the Department, agrees not to videotape the execution without the consent of the criminal condemned, and "requests only to be allowed to film the execution from the same location as seen by other witnesses." Stipulation, at 4.[3]

The petition is based upon two premises. The first is that citizens of this State have a constitutional right to attend executions. The second is that a journalist who witnesses an execution also has the right to videotape it.

■ The petitioner grounds his claim of right to attend the execution on Const. art. 1, § 30: "The enumeration in this Constitution of certain rights shall not be construed to deny others retained by the people." The case cited, *State v. Clark*, 30 Wash. 439, 71 P. 20 (1902), however, holds only that this constitutional provision will not defeat the enactment of an inheritance tax. *Clark* says nothing about executions, or about whether attendance at an execution is the type of "fundamental, inalienable [right] under the laws of God and Nature" which is protected under Const. art. 1, § 30. *Clark*, at 444. It does not support an argument that the State must disprove the existence of his right to attend an execution.[4]

We cannot find a right to attend an execution on such a legal showing. Absent such a right, the petitioner's further argument that he has a constitutional right to videotape an execution is unsupported.

The petitioner would find a right to videotape an execution in Const. art. 1, § 5: "Every person may freely speak, write and publish on all subjects, being responsible for the

---

[3]Director Kincheloe had expressed concern in his affidavit that the relatively small size of the windows between the witness room and the execution rooms might lead to a request that filming be done in the execution rooms.

[4]Mr. Halquist's only other support for his contention is an anecdote about two sheriffs of Spokane County, one a lame duck and the other newly elected, who both gave out a set of invitations to a hanging. While this story suggests that hangings were once well–attended spectacles, it does not show that attendance is or ever was considered a right retained under Const. art. 1, § 30. Indeed, if the public has a right to attend executions, invitations would not be required.

abuse of that right." He notes that this court has said Const. art. 1, § 5 "seems to rule out prior restraints under *any* circumstances, leaving the State with only post–publication sanctions to punish abuse of free speech rights." *State v. Coe,* 101 Wn.2d 364, 374, 679 P.2d 353 (1984). This bar on prior restraints is not generally held to be absolute. This court held in *Coe,* however, that a party who has lawfully obtained information which has been admitted into evidence in open court does have an absolute right to publish or broadcast the information accurately.

Here, the petitioner does not argue that he has an absolute right to videotape an execution; rather, he contends that the State may prevent him from doing so only if it has a compelling interest.

The Department counters by pointing out the important qualification to the *Coe* holding: the right to publish applies only to those who have previously and lawfully obtained the information. The Department relies on *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980), where the question was whether the trial court properly barred the press and public from a pretrial suppression hearing. In deciding this question under Const. art. 1, § 5, this court distinguished between prior restraints and restraints on access to information:

> We agree with respondent that there is a substantial difference between the right to publish already acquired information and the right to attend a proceeding for the purpose of news gathering.

*Kurtz,* at 58.

The Department thus argues that its ban on videotaping is simply a permissible restraint on access to information. The petitioner replies that the presence of 12 members of the press in the witness room assures access, but the taping ban restricts the methods to be employed in disseminating the information they gain. He relies on a passage from *Coe* where this court found a qualitative difference between broadcasting tape recordings and reporting their contents. *See Coe,* at 383 (noting that inflections in

voice on recorded tapes constitute "substantive information which could not be adequately communicated" by other means). However, common experience suggests that a videotape of an execution is information that is qualitatively different from a mere verbal report about an execution. It follows that a taping ban is a limitation on access to substantive information, not a limitation on dissemination.

Cases construing the United States Constitution support this reasoning. The Supreme Court has held that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Pell v. Procunier,* 417 U.S. 817, 833, 41 L. Ed. 2d 495, 94 S. Ct. 2800 (1974) (although press had access to prison and prisoners generally, prison regulations validly prohibited press interviews with individually selected prisoners). A decision directly on point relied on *Pell* in holding that the First Amendment did not require Texas to allow a news cameraman to film an execution. *Garrett v. Estelle,* 556 F.2d 1274 (5th Cir. 1977). As stated in *Garrett,* at 1277:

News gathering is protected by the first amendment, for "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). This protection is not absolute, however. As the late Chief Justice Warren wrote for the Supreme Court, "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). In *Branzburg* the Court said, "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes, supra,* 408 U.S. at 684, 92 S.Ct. at 2658. Relying on *Branzburg* and *Zemel* the Court has recently held, "The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974); *accord, Saxbe v. Washington Post Co.,* 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974).

The opinion further points out that equal protection is not denied since the state media regulation prevents *all* persons, including television, print and radio reporters, and the general public from photographing executions. Moreover, because the Constitution does not guarantee access, the *Garrett* court reasoned, the government also need not show that its prison regulation is supported by a "compelling state interest." *Garrett,* at 1279.

While the petitioner argues for an independent interpretation of Const. art. 1, § 5, he does not explain how this interpretation leads to the conclusion that a restriction on filming is a restriction on the dissemination of news rather than a restriction on access. Neither the decisions of this court nor the wording and history of Const. art. 1, § 5 provides a theoretical basis for his contention. *See State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986).

For the foregoing reasons, this court dismissed the petition against state officers.