CALIFORNIA FIRST AMENDMENT CO-ALITION; Society of Professional Journalists, Northern California Chapter, Plaintiffs–Appellees,

v.

Arthur CALDERON, Warden; James Gomez, Director, Department of Corrections, Defendants–Appellants.

No. 97–15493.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1997.

Opinion Filed April 28, 1998.

Opinion Withdrawn July 23, 1998.

Decided July 23, 1998.

---

Karl S. Mayer, Office of the Attorney General, San Francisco, California, for defendants-appellants.

David M. Fried, Law Offices of David M. Fried, San Francisco, California, for plaintiffs-appellees.

Before: BROWNING, PREGERSON and HAWKINS, Circuit Judges.

### ORDER

The Opinion filed April 28, 1998 and appearing at 138 F.3d 1298 (9th Cir.1998), is withdrawn.

## OPINION

### MICHAEL DALY HAWKINS, Circuit Judge:

Arthur Calderon, Warden of San Quentin Prison, and James H. Gomez, Director of the California Department of Corrections (collectively "Calderon"), appeal the district court's injunction requiring them to allow witnesses to executions by lethal injection to view the procedure from the time the inmate is secured to the gurney until just after the pronouncement of death. The injunction was granted in an action brought pursuant to 42 U.S.C. § 1983 by the California First Amendment Coalition and the Society of Professional Journalists, Northern California Chapter, alleging that the defendants' handling of the February 23, 1996 execution of William Bonin violated the public's First Amendment right of observation of and access to government proceedings.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## FACTS AND PRIOR PROCEEDINGS

### The History and Scope of Access to Executions in California

Before 1858, California had public hangings. *See People v. Anderson*, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880, 890 n. 25 (1972). In 1858, the California Legislature passed a statute moving executions inside county jails and requiring "at least 12 reputable citizens" to be in attendance. The current witness statute, Cal.Penal Code § 3605, is virtually identical to the 1858 statute.[1]

Although neither § 3605 nor the 1858 statute requires that members of the press be present, members of both the press and the public have attended executions in California from the 1860's until the present.[2] While logistical and other concerns have kept most members of the general public from attending executions, the press has been a constant presence.

As witnesses to executions, members of both the media and the general public traditionally have had some access to the events surrounding the execution itself. This access has enabled the press to observe and report on matters such as the condemned's demeanor in his final minutes as well as any final words he may have spoken. For example, until California abandoned hanging as a method of execution in 1936, witnesses in that state could view executions in their entirety, from the condemned's ascent up the gallows to the fall of the trap door.[3] Similarly, when California switched to lethal gas in 1937, witness observation of executions began from the time the condemned was escorted into the gas chamber until pronouncement of death.[4] Eyewitness media reports of the first lethal gas executions sparked

---

1. Cal.Penal Code § 3605 (1997) provides that:

   The warden ... shall ... invite the presence of two physicians, the Attorney General ... and at least 12 reputable citizens, to be selected by the warden. The warden shall, at the request of the defendant, permit those ministers of the Gospel, not exceeding two, as the defendant may name, and any persons, relatives or friends, not to exceed five, to be present at the execution, together with those peace officers as he or she may think expedient, to witness the execution. But no other persons than those specified in this section may be present at the execution....

2. While § 3605 would seem to prohibit members of the press, other than journalists who might be included among the "12 reputable citizens," from attending executions, the statute has never been enforced in this way. Rather, members of the press have been allowed to observe and report on executions up until the present. Indeed, the prison procedure at issue here, San Quentin

Institution Procedure No. 770, allots 17 out of 50 spaces in the observation room for members of the media..

3. *See, e.g., Exit Wheeler*, The Daily Examiner (San Francisco), Jan. 24, 1884, at 2; *His Iron Nerves Unshaken to the End: William Henry Durrant Goes to His Sudden Death Without A Word to Explain Away the Mystery of Why He Murdered Blanche Lamont*, The Examiner (San Francisco), Jan. 8, 1896, at 1; Frank C. Sullivan, *'Let'er Go,' Says Sloper in Death at Folsom: Murder of San Francisco Policeman Weak on Gallows Yet Defiant in Mood*, The Sacramento Bee, June 25, 1926, at 1.

4. *See, e.g., Dying Convict Brands Gas Cell 'Too Slow'*, S.F. Examiner, Dec. 10, 1938, at 1; Gale Cook, *Santo Murder Trio Executed; Delays Torture Barbara: Two Men Jest in Gas Chamber*, S.F. Examiner, June 4, 1955, at 1; Hadley Roff, *Executed Man Tries to 'Tell'-But Fails*, S.F. News–Call Bulletin, May 13, 1960, at 1.

public debate over this form of execution and the death penalty itself.[5]

California is currently enjoined from using lethal gas as a method of execution. *See Fierro v. Gomez*, 77 F.3d 301 (9th Cir.1996). In the two most recent lethal gas executions, consistent with historical practice and San Quentin Institution Procedure No. 769 (the applicable procedure for lethal gas executions), witnesses were allowed to be present in the observation room before the inmate was led into the gas chamber.

Currently, California uses only lethal injection. In implementing this form of execution in 1992, new regulations were issued limiting witness observation of the execution, San Quentin Institution Procedure No. 770 ("Procedure 770").[6] Procedure 770 provides, in part, that before witnesses are present in the observation room: (1) the condemned is escorted into the chamber and strapped to the gurney; (2) the execution team inserts two intravenous ("IV") tubes into the inmate's veins; (3) the team leaves the chambers; and (4) the normal saline IV's are started and are running properly. Witnesses in the observation room are then able to view the condemned and, pursuant to the Warden's command, lethal chemicals are administered until the inmate is dead.

While Procedure 769 allows witnesses to lethal gas executions to view the execution from the time the condemned is led into the gas chamber and strapped into the chair, Procedure 770 allows witnesses to lethal injection executions to view the process only after the condemned has been strapped to the gurney and an IV saline solution is running. Lethal gas executions expose the prison staff for approximately one minute, while lethal injection executions can take as much as twenty minutes for the staff to prepare the condemned for execution. Calderon explains that twenty minutes of exposure to witnesses will increase the likelihood of an

identification of execution team members. In turn, "[t]his would subject the officers' and their families to harassment and intimidation which would impact the officers' execution of their duties and would compromise the safety and security of the officers, their families, and the institution." It is out of this concern for staff safety and institutional security that Calderon adopted Procedure 770.

Procedure 770 was followed for the first and only time at the execution of William Bonin on February 23, 1996.[7] After Bonin had been strapped to the gurney and the IV inserted, witnesses were admitted to the observation room and the curtain was drawn aside. The witnesses could see Bonin motionless as he was strapped to the gurney with the IV tubes already inserted and running. Five minutes later, the witnesses were told that Bonin was dead. According to the district court:

> [W]itnesses were allowed to enter the observation room adjoining the execution chamber only after the condemned had been strapped to the gurney and the intravenous ("IV") tubes had been inserted into his arms. The witnesses did not hear the execution order. After several minutes in the observation room, the witnesses were told that the prisoner was dead.

*California First Amendment Coalition v. Calderon*, 956 F.Supp. 883, 884 (N.D.Cal. 1997). The witnesses' information concerning those portions of the execution they were not allowed to see, including the execution team's difficulty in administering the procedure (i.e., insertion of the IV tubes), was limited to what they were told by prison officials.

**The District Court Proceedings**

Plaintiffs, the California First Amendment Coalition and the Society of Professional Journalists, Northern California Chapter

---

**5.** *See* A.D. Hyman, *2 Killers Gassed; Chorus of Protest Arises at Ordeal: Witnesses Condemn Cruelty of Method*, S.F. Examiner, Dec. 1, 1938, at 1.

**6.** Procedure 770 was adapted from procedures used by the State of Texas in conducting lethal injection executions.

**7.** Procedure 770 provides that 17 of the 50 spaces in the witness area will be provided to members of the press and that those 17 individuals will report their observations to other members of the press at a press conference immediately following the execution. Both of these procedures were followed for the Bonin execution.

("Coalition"), brought an action against Arthur Calderon, Warden of San Quentin Prison, and James H. Gomez, Director of the California Department of Corrections, alleging that Calderon's new practices violated their First and Fourteenth Amendment rights to view crucial aspects of the execution. The Coalition filed a complaint as well as a motion for preliminary injunction in April 1996. The district court granted the Coalition's motion, entering a preliminary injunction which prohibited defendants from "preventing witness observation of executions from at least just before the time intravenous tubes are inserted to at least just after death."

Calderon appealed the preliminary injunction and filed a request for an emergency stay of the injunction, which we denied. *California First Amendment Coalition v. Calderon,* No. 96–15798, 1996 WL 442471 (August 5, 1996).

In the fall of 1996, the parties filed cross-motions for summary judgment in the district court. The district court granted the Coalition's motion for summary judgment in February 1997. *See California First Amendment Coalition,* 956 F.Supp. at 883. In granting summary judgment, the district court entered a permanent injunction restraining Calderon from preventing the witnesses from "view[ing] the procedure from at least the point in time just prior to the condemned being immobilized, that is strapped to the gurney or other apparatus of death, until the point in time just after the prisoner dies." *Id.* at 890.

Calderon appeals the district court's judgment and order of permanent injunctive relief.

## STANDARDS OF REVIEW

A grant of summary judgment is reviewed de novo. *See Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 834 (9th Cir.

1997). The appellate court's review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *See Ghotra v. Bandila Shipping, Inc.,* 113 F.3d 1050, 1054 (9th Cir.1997). This court must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *See Covey,* 116 F.3d at 834.

■ Moreover, a district court's ruling on the constitutionality of a state statute is reviewed de novo. *See Bland v. Fessler,* 88 F.3d 729, 732 (9th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 513, 136 L.Ed.2d 403 (1996); *NCAA v. Miller,* 10 F.3d 633, 637 (9th Cir.1993).

## STANDING

■ Under *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977):

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Applying this test, we conclude that the Coalition has standing to bring this suit.

The Coalition consists of 250 print and broadcast journalists representing a number of different news sources. Many of these individuals and the particular organizations they represent have covered or observed executions in the past and are likely to do so in the future. The restrictive procedures of which the Coalition complains could hinder its members' ability to do their work and would cause an injury in fact to them.[8] *See Branzburg v. Hayes,* 408 U.S. 665, 680–82, 92

---

8. In addition to alleging an "injury in fact," the plaintiff must also show that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Org's, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Although we conclude that Procedure 770 does not violate the Coalition's First Amendment rights to gather news, the Coalition "asserts an interest that is at least 'arguably' protected by the first amendment." *Radio & Television News Ass'n v. U.S. Dist. Court,* 781 F.2d 1443, 1446 (9th Cir.1986).

S.Ct. 2646, 33 L.Ed.2d 626 (1972) (First Amendment protects news gathering). In particular, the Coalition members could be stifled in reporting to the public about how executions were being carried out.

Moreover, the interests the Coalition seeks to protect here—to cover and report news without government interference—are germane to the Coalition's purpose. Finally, neither the First Amendment claim nor the injunctive relief requested requires the participation of individual members in this lawsuit.

## ANALYSIS

■ The right of the press to gather news and information is protected by the First Amendment because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg,* 408 U.S. at 681, 92 S.Ct. 2646. Although substantial, the protection is not without limits. For example, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* at 684, 92 S.Ct. 2646.

Relevant to this case, the Supreme Court has held that the press has "no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Employing this principle the Court has upheld, on three occasions, prison regulations that prevented the media from conducting interviews with inmates. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (upholding denial of media requests for a special inspection of facilities and interview of inmates); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) (upholding regulations prohibiting the media from conducting face-to-face interviews with specific inmates); *Pell,* 417 U.S. at 817, 94 S.Ct. 2800 (upholding regulations

which limited media selection of particular inmate for interview).

In each of these cases, the Court found that, because the challenged policies did not "deny the press access to sources of information available to members of the general public," those policies did not violate the First Amendment. *Pell,* 417 U.S. at 835, 94 S.Ct. 2800.

■ Both the district court and the Coalition attempt to distinguish these cases on the basis that they deal with the everyday workings of a prison while this case focuses on executions. Executions, they argue, involve an important and controversial exercise of state power that lies at the very heart of our criminal justice system. Thus, the district court and the Coalition liken this case to a line of cases in which the Supreme Court recognized that the First Amendment protects the rights of the press and the public to observe certain governmental proceedings. *See Richmond Newspapers Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (First Amendment protects public access to criminal trials); *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (preliminary hearings); *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (voir dire); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (trials involving sex crimes against minors).[9]

We agree that executions are unquestionably matters "of great public importance." *Pell,* 417 U.S. at 830 n. 7, 94 S.Ct. 2800. Moreover, we believe that more information leads to a better informed public. Indeed, we acknowledge that "the role of the media is important; acting as the 'eyes and ears' of the public, they can be a powerful and constructive force, contributing to remedial action in the conduct of public business." *Houchins,* 438 U.S. at 8, 98 S.Ct. 2588.

9. In applying First Amendment protection to these various situations, the Supreme Court has found that the public has a right to access if: (1) the proceeding in question "historically has been open to the press and the general public"; and (2) if the access "plays a particularly significant role in the functioning of the judicial process and

the government as a whole." *Globe Newspaper Co.,* 457 U.S. at 605–06, 102 S.Ct. 2613. Applying the test to this case, the district court found both historical precedent and functional importance which support public access to and observation of executions. *See California First Amendment Coalition,* 956 F.Supp. at 888–89.

■ Nonetheless, we reject the argument that an issue like the protections of the First Amendment are dependent upon the notoriety of the death penalty. *See Garrett v. Estelle,* 556 F.2d 1274, 1279 (5th Cir.1977) (First Amendment does not require Texas to allow televised executions). The Supreme Court has told us that the First Amendment does not protect the right of the press to gather news in prisons not available to the public, and we agree with the Fifth Circuit that "this holding is not predicated upon the importance or degree of interest in the matter reported." *Id.*

Accordingly, we respect the Supreme Court's limitations on the amount and type of government information that must be made available to the public and the press. In particular, "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Pell,* 417 U.S. at 822, 94 S.Ct. 2800.

■ We emphasize that the Supreme Court has never flatly held that the press has no First Amendment right to view events inside prison walls; only that such a right is co-extensive with the public's right to the same information. Although the Supreme Court did not explicitly so state, we infer that the press has no First Amendment right to the access sought in *Houchins, Saxbe,* and *Pell* only because the public has no First Amendment right to that access. Thus, Calderon cannot succeed here simply because the press has no right of access greater than that of the public. We must consider the possibility that the public has a First Amendment right to observe executions. If such a right exists, Calderon would concede, the press has this right as well.

In analyzing the proposed First Amendment interests at stake here, we are mindful that no court, other than the district court in this action, has held that the First Amend-

ment assures public or press access to view executions. Indeed, in *Holden v. Minnesota,* 137 U.S. 483, 11 S.Ct. 143, 34 L.Ed. 734 (1890), the only case in which the Supreme Court discussed a state's restrictions on media or public access to executions, the Court upheld a total ban on both. Although *Holden* dealt largely with ex post facto questions, the Court also discussed a section of law which totally excluded the media from executions and which made it illegal for a newspaper to publish any "account of the details of such execution, beyond the statement of the fact that such convict was on the day in question duly executed according to law." *Id.* at 486, 11 S.Ct. 143. Regarding these restrictions on the press, the Court held that "[t]hese are regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions occurring after the passage of the act." *Id.* at 491, 11 S.Ct. 143.

Reading *Holden* and *Pell* in combination, whatever First Amendment right might exist to view executions, the "right" is severely limited. Accordingly, we hold that Procedure 770 does not violate the First Amendment rights of either the press or the public.

Procedure 770 allows witnesses to view an execution from just after the IV has been inserted into the condemned and a saline solution is running until the condemned is pronounced dead. This procedure does not cut off all access to information regarding executions. Rather, Procedure 770 allows for some access and observation, while it minimizes the exposure of the members of the execution team to the media or other witnesses, out of a concern for staff safety and institutional security.

We stress that we are not holding that the public and the press do not have First Amendment rights to view executions.[10] Rather, our holding is limited to the facts of this case. Calderon asserts that the limitations on viewing contained in Procedure 770 are "directly related to prison security, staff safety, and the orderly operation of the institutional procedure." The procedures sur-

---

10. As described in this opinion, California has a long history of allowing media observation of its executions. Calderon asserts that he has no interest in reducing the extent of this observation more than is allowed by Procedure 770. If Cal-

deron were to attempt a greater limitation on the press' observation, we would have to revisit the issue and determine whether some First Amendment right was being abridged.

rounding an execution "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell,* 417 U.S. at 827, 94 S.Ct. 2800. We do not have substantial evidence indicating an exaggerated response here and, therefore, defer to prison officials in this matter. Whatever First Amendment protection exists for viewing executions, it is not violated by Procedure 770.

Accordingly, we reverse and remand this action to the district court with instructions to determine whether the Coalition has presented "substantial evidence" that Procedure 770 represents an exaggerated response to Calderon's security and safety concerns.

**REVERSED AND REMANDED.**