**ENTERTAINMENT NETWORK INC., Plaintiff,**

**Liveontheweb.com, Inc., a Florida Corporation, Intervening Plaintiff,**

v.

**Harley LAPPIN, in his official capacity as Warden of the United States Penitentiary Terre Haute; Kathleen Hawk Sawyer, in her official capacity as Director of the United States Federal Bureau of Prisons; and John Ashcroft, in his official capacity as the United States Attorney General, Defendants.**

**No. TH01–0076–C–T/H.**

United States District Court, S.D. Indiana, Terre Haute Division.

April 18, 2001.

---

Derek A. Newman, Newman & Newman, Seattle, WA, Stephen L. Trueblood, Trublood Bitterman Lewis & Rodway, Terre Haute, IN, for Plaintiff.

Gerald A. Coraz, United States Attorney's Office, Indianapolis, IN, for Defendants.

## ENTRY FOLLOWING TRIAL

TINDER, District Judge.

### I. Introduction

#### A. Summary

The relief sought in this case is the logical extension of Marshall McLuhan's prophetic proposal from the 1960s that the "medium is the message." Federal regulations guarantee that representatives of the media are entitled to observe a federal execution in the same manner as other citizen witnesses. No restrictions whatsoever are placed on how the media representatives report on what they observe. But that is not enough for the Plaintiff and the Intervening Plaintiff-they seek not just to view the execution—they seek to film it and broadcast it simultaneously over the Internet so that anyone willing to pay a fee for viewing this event can do so. They are not satisfied that the traditional means of reporting such events—eyewitness accounts by experienced reporters—is sufficient to convey the magnitude of this occasion. What these media organizations seek is unprecedented in that a live media broadcast of an execution has never occurred in the history of the death penalty in this country. It is also unprecedented as that term is used in law-no court in this nation has ever ordered relief of this nature before.

#### B. Background

Plaintiff Entertainment Network, Inc. ("ENI") is a Florida corporation which provides news, entertainment, and information via the Internet World Wide Web. Intervening Plaintiff Liveontheweb.com, Inc. is also a Florida corporation and is engaged in the business of broadcasting and allowing public broadcasting of news, programs, and entertainment via the Internet World Wide Web. The Defendants are Harley Lappin, the Warden of the United States Penitentiary at Terre Haute (USPTH), Kathleen Hawk Sawyer, Director of the Federal Bureau of Prisons (BOP), and John Ashcroft, United States Attorney General. The USPTH is an institution operated by the BOP.

ENI filed this action for declaratory and injunctive relief, challenging the constitutionality of 28 C.F.R. § 26.4(f), prohibiting photographic, audio and visual recording devices at federal executions. Liveontheweb.com, Inc.'s intervention is for the limited purpose of securing the same right of access to which ENI is determined to possess. Counsel for Liveontheweb.com, Inc. assured the court that it had no arguments to add to those submitted by ENI, so their claims rise or fall together. Because Liveontheweb.com, Inc.'s legal claims in this action are fully duplicative of those of ENI, the ruling here will often refer only to the original Plaintiff, ENI.

This cause came before the court for trial on Tuesday, April 17, 2001. The parties were present through their counsel of record. In addition, a motion to intervene was granted, pursuant to Rule 24(b) of the *Federal Rules of Civil Procedure*, over the original parties' objections.

This Entry sets forth the court's findings of fact and conclusions of law as required by Rule 52(a) of the *Federal Rules of Civil Procedure* and also constitutes its findings and conclusions with respect to the Defendants' motion to dismiss.

### II. Findings of Fact

Timothy McVeigh has been sentenced to death as a result of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, on April 19,

1995, which resulted in the deaths of 168 people. *United States v. McVeigh,* 153 F.3d 1166 (10th Cir.1998), *cert. denied,* 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999). McVeigh is incarcerated at the USPTH, and his execution is scheduled to be carried out through lethal injection at the USPTH on May 16, 2001.

The scheduled execution of Timothy McVeigh has drawn and will draw considerable media and public attention, just as did the investigation of the Oklahoma City bombing, the trial of Timothy McVeigh, and the sentencing and post-sentencing matters associated with the case. ENI and Liveontheweb.com, Inc. are part of the media.

"The control and management of Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof...." 18 U.S.C. § 4001(b)(1). The Attorney General has delegated this authority to the BOP through 28 C.F.R. § 0.96 (1997) ("The Director of the Bureau of Prisons is authorized to exercise or perform any of the authority, functions, or duties conferred or imposed upon the Attorney General by any law relating to the commitment, control, or treatment of persons ... charged with or convicted of offenses against the United States....").

BOP regulations specify who shall be permitted to attend federal executions. Those regulations provide, in pertinent part:

(c) In addition to the Marshal [a United States Marshal designated by the Director of the BOP] and Warden, the following persons shall be present at the execution:

(1) Necessary personnel selected by the Marshal and Warden;

(2) Those attorneys of the Department of Justice whom the Deputy Attorney General determines are necessary;

(3) Not more than the following numbers of persons selected by the prisoner:

(i) One spiritual adviser;

(ii) Two defense attorneys; and

(iii) Three adult friends or relatives; and

(4) Not more than the following numbers of persons selected by the Warden:

(i) Eight citizens; and

(ii) Ten representatives of the press.

28 C.F.R. § 26.4(c). In addition, and central to the dispute in this case, another BOP regulation provides that:

No photographic or visual or audio recording of the execution shall be permitted.

28 C.F.R. § 26.4(f).

Notwithstanding the above regulation, ENI sought permission from the BOP through a letter dated March 20, 2001, to serve as the media pool witness to the execution of McVeigh, and in addition requested permission to bring a small camera to the witness chamber of the execution and to record and simultaneously broadcast the execution via the Internet to the public.[1] In the alternative, ENI re-

---

**1.** ENI's proposal was that "[t]he camera will transmit a wireless signal to a broadcast facility vehicle, which vehicle will be parked about one (1) mile outside of the prison complex. The broadcast facility vehicle would then transmit the audiovisual signal of the execu- tion to ENI's webcast headquarters in Tampa, Florida, where the signal would be made available to the public via the Internet. The camera operator will require only two (2) hours to setup the camera and establish connection to the broadcast facility vehicle."

quested that the BOP provide ENI with access to a live audiovisual transmission of the execution, and permit ENI to broadcast that material. The BOP responded on March 28, 2001, and in such response denied ENI's requests. The BOP cited the regulation quoted above and provided additional reasons for its decision. Specifically, the BOP stated in its letter that the government interests furthered by the prohibition on photographic, audio and visual recording of executions are "not sensationalizing the event, maintaining prison security and good order, and respecting the privacy interests of the condemned individual." The filing of this action followed, and has developed as already described.

At trial, the parties introduced a written stipulation, the content of which is the following:

1. Attorney General John D. Ashcroft has approved a request by survivors and victims' families of the April 19, 1995 bombing of the Alfred P. Murrah building in Oklahoma City, Oklahoma to be permitted to view in Oklahoma City a closed circuit transmission of the execution of Mr. Timothy McVeigh.

2. Federal authorities will provide a highly reliable and secure closed circuit audio and video transmission from the United States penitentiary in Terre Haute, Indiana to the designated site in Oklahoma City.

3. The broadcast will use encryption technology integrated with state-of-the-art video-conferencing over high-speed digital telephone lines.

4. The closed circuit transmission will be instantaneous and contemporaneous and no recording, permanent or temporary, will be made.

5. The transmission to the victims in the Oklahoma City area will begin at the same time the curtain is open for viewing by the victim witnesses in the execu-

tion facility. The Bureau of Prisons and other federal officials will be responsible for ensuring that only authorized survivors and family members of victims, and designated counselors and government representatives will be permitted to view the transmission.

6. No recording, audio or visual, will be permitted at the designated site in Oklahoma City where the transmission is to be made. The Bureau of Prisons and other federal officials present at the designated site in Oklahoma City, where the transmission is to be made, will ensure that the survivors and victims' families are informed as to the prohibition regarding recording, either through audio or visual means, of the transmission of the execution and that no such recording is made.

Also at trial ENI introduced, over the objection of the Defendants, the affidavit of one of ENI's attorneys, Stephen L. Trueblood. Mr. Trueblood's affidavit recites the hearing of public statements by the United States Attorney General, John Ashcroft, explaining that all the citizens of the United States were victims of the crimes perpetrated by Mr. McVeigh.

### III. Discussion

#### A.

■ This case arises under the United States Constitution and the laws of the United States and presents a federal question within this court's jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1361 and 2201. Venue in this action is appropriate pursuant to 28 U.S.C. § 1391(e).

■ The Defendants are sued in their official capacities, which makes this action in all but name against the United States. *Bavido v. Apfel,* 215 F.3d 743, 747 n. 3 (7th Cir.2000). The United States cannot be sued without its consent, which is a prerequisite to the federal courts' exercise of

jurisdiction. *See United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Although 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," § 1331 "does not by itself operate as a waiver of sovereign immunity." *Kanemoto v. Reno*, 41 F.3d 641, 643–44 (Fed.Cir. 1994). Similarly, the Declaratory Judgment Act, 28 U.S.C. § 2201, does not constitute an independent grant of jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).

 The doctrine of sovereign immunity, however, is not always applicable to suits filed against federal entities or officials. In particular, one of the well-established exceptions to the doctrine limits its application in declaratory and/or injunctive suits against federal entities or officials seeking to enjoin the enforcement of an unconstitutional statute. *Dugan v. Rank*, 372 U.S. 609, 621–22, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (explaining that the traditional equity powers of the judiciary extend to suits to compel individual administrative officers to refrain from acts that overstep their authority). As the Court noted in *Larson*, the doctrine does not apply in such cases because "the conduct against which specific relief is sought is beyond the officer's power and is, therefore, not the conduct of the sovereign." *Larson*, 337 U.S. at 690, 69 S.Ct. 1457. "Any other rule would mean that a claim of sovereign immunity would protect a sovereign in the exercise of power it does not possess." *Tenneco Oil Co. v. Sac & Fox Tribe*, 725 F.2d 572, 574 (10th Cir.1984).

The precise question which the court finds presented in this case is thus whether the BOP's challenged regulation, found at 28 C.F.R. § 26.4(f), violates ENI's First Amendment right to videotape and broadcast the execution of Timothy McVeigh. The challenge to 28 C.F.R. § 26.4(f) is to its face, meaning that, if successful, the restriction could not be enforced as to any member of the media. *See Bd. of Trustees v. Fox*, 492 U.S. 469, 483, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir.1997), *cert. denied*, 523 U.S. 1036, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998).

### B.

 The right of the press to gather news and information is protected by the First Amendment because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Although substantial, the protection is not without limits. "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

Despite certain broad language in ENI's arguments here, primarily in its written filings, the right ENI seeks to vindicate is not the media's access to the execution. On the contrary, the BOP's regulation provides for the presence of the media.[2]

---

2. 28 C.F.R. § 540.64 provides as follows:
 Press pools.
 (a) The Warden may establish a press pool whenever he or she determines that the frequency of requests for interviews and visits reaches a volume that warrants limitations.

 (b) Whenever the Warden establishes a press pool, the Warden shall notify all news media representatives who have requested interviews or visits that have not been conducted. Selected representatives are admitted to the institution to conduct

There is no suggestion that this portion of the regulation will not be honored. Whether ENI in particular is selected as among the "ten representatives of the press" is also not at issue. It is highly doubtful that the site of the execution, inside the USPTH, is truly "public." However, the parties agree that regulations providing for the presence of members of the public and representatives of the press establish that the public will have access to the execution "by proxy."

The First Amendment right to gather news has been defined in terms of information available to the public generally. *Estes v. Tex.*, 381 U.S. 532, 584, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) ("When representatives of the communications media attend trials they have no greater rights than other members of the public.") (Warren, J., concurring). That right collides in this case with the right of the government, through its properly designated prison administrators, to carry out complex and important responsibilities.

### C.

Cases in which the same or closely analogous questions have been considered have consistently, and perhaps even uniformly, held that restrictions such as created by 28 C.F.R. § 26.4(f) are constitutional.

■ The press has "no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell v. Procunier*, 417 U.S. 817, 834, 94

S.Ct. 2800, 41 L.Ed.2d 495 (1974). Employing this principle the Court has upheld, on three occasions, prison regulations that prevented the media from conducting interviews with inmates. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (upholding denial of media requests for a special inspection of facilities and interview of inmates); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) (upholding regulations prohibiting the media from conducting face-to-face interviews with specific inmates); *Pell*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (upholding regulations which limited media selection of particular inmate for interview). In each of these cases, the Court found that, because the challenged policies did not "deny the press access to sources of information available to members of the general public," those policies did not violate the First Amendment. *Pell*, 417 U.S. at 835, 94 S.Ct. 2800.

In *Holden v. Minnesota*, 137 U.S. 483, 11 S.Ct. 143, 34 L.Ed. 734 (1890), the Supreme Court upheld a state's total ban on both media and public access to executions. The Court held that "[t]hese are regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions occurring after the passage of the act." *Id.* at 491, 11 S.Ct. 143.

In *Pell*, inmates and reporters challenged regulations prohibiting face-to-face

the interviews under the specific guidelines established by the Warden.

(c) All members of the press pool are selected by their peers and consist of not more than one representative from each of the following groups:

(1) The national and international news services;

(2) The television and radio networks and outlets;

(3) The news magazines and newspapers; and

(4) All media in the local community where the institution is located. If no interest has been expressed by one or more of these groups, no representative from such group need be selected.

(d) All news material generated by such a press pool is made available to all media without right of first publication or broadcast.

media interviews with specific prisoners. The infringement on prisoners' rights, the Court held, was reasonable because prisoners could write letters to the media-a means of communication less disruptive than the physical entry of reporters into the prison. *Id.* at 824, 94 S.Ct. 2800. The reporters' assertion of a special right of access could not prevail, the Court explained, because the First Amendment does not give the media greater access to public events or institutions-including prisons-than it gives ordinary citizens. *Id.* at 835, 94 S.Ct. 2800.

In *California First Amendment Coalition v. Calderon,* 150 F.3d 976 (9th Cir. 1998), the Ninth Circuit Court of Appeals considered a challenge to a prison regulation, San Quentin Institution Procedure No. 770, which limited witness observation of an execution. Essentially, the regulation allows witnesses to lethal injection executions to view the process only after the condemned has been strapped to the gurney and an IV saline solution is running. This prevents witnesses from hearing the warden's order to carry out the execution and from observing the placing of the condemned on the gurney and the insertion of the IV. Procedure No. 770 was challenged on First Amendment grounds. The Ninth Circuit (1) agreed that executions are unquestionably matters of great public importance, and (2) acknowledged that the role of the media is important, but "reject[ed] the argument that an issue like the protections of the First Amendment are dependent upon the notoriety of the death penalty." *Id.* at 981–82. It then found the challenged regulation to be valid, explaining:

> This procedure does not cut off all access to information regarding executions. Rather, Procedure 770 allows for some access and observation, while it minimizes the exposure of the members of the execution team to the media or other witnesses, out of a concern for staff safety and institutional security.

*Id.* at 982. A further statement of the principles underlying the determination was then made:

> We stress that we are not holding that the public and the press do not have First Amendment rights to view executions. Rather, our holding is limited to the facts of this case. Calderon asserts that the limitations on viewing contained in Procedure 770 are "directly related to prison security, staff safety, and the orderly operation of the institutional procedure." The procedures surrounding an execution "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell,* 417 U.S. at 827, 94 S.Ct. 2800, 41 L.Ed.2d 495. We do not have substantial evidence indicating an exaggerated response here and, therefore, defer to prison officials in this matter. Whatever First Amendment protection exists for viewing executions, it is not violated by Procedure 770.

*Id.* at 982–83 (footnote omitted). The case was then remanded to the district court with instructions to determine whether the plaintiff had presented "substantial evidence" that Procedure 770 represented an exaggerated response to Calderon's security and safety concerns. The remand produced a written order, found at 88 F.Supp.2d 1083 (N.D.Cal.2000), in which the district court found that the conflicting presentations of the parties required resolution through trial, rather than via summary judgment.

The Ninth Circuit's decision rested in part on the decision of the Fifth

Circuit Court of Appeals in *Garrett v. Estelle*, 556 F.2d 1274 (5th Cir.1977), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978). *Garrett* involved a television news cameraman's First Amendment challenge to a Texas policy prohibiting the filming of executions in a state prison for showing on television. Texas allowed full access to the event by newsmen, but denied recording of an execution by any mechanical means, such as photography, sound recording or motion picture. The Fifth Circuit's analysis of the challenge rested on the plaintiff's right of co-extensive access to the execution with that of the public, and found that because the public had no right to film an execution, neither did the plaintiff, and that there was neither precedent nor reasons of policy (relating to the subject matter of the event) which compelled a different result. *Id.* at 1277–78. Although as ENI correctly points out, *Garrett* is not precedent which binds this court, *Sec. Bank S.S.B. & Subsidiaries v. Comm'r of Internal Revenue*, 116 F.3d 302, 303 (7th Cir.1997), the parties have cited to no controlling precedent from the Seventh Circuit, and *Garrett* is entitled in these circumstances to whatever weight its intrinsic persuasiveness merits, *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir.1987). That is considerable, which evidently also animated the decision of the Supreme Court of Washington in *Halquist v. Department of Corrections*, 113 Wash.2d 818, 783 P.2d 1065 (1989) (per curiam) (finding ban on videotaping executions a proper limit on media right to access under the Constitution of the State of Washington).

Although no direct comparison can be made between the atmosphere of prison, specifically execution chambers, and any other part of the world at large, it is helpful to look at how the courts have treated the subject of media access to public information and events in a particular form in other arenas.

In *JB Pictures, Inc. v. Department of Defense*, 86 F.3d 236 (D.C.Cir.1996), the United States Court of Appeals for the District of Columbia upheld as consistent with the First Amendment a Department of Defense policy allowing families of soldiers killed abroad to prevent members of the press from attending the return of soldiers' bodies to the United States. In the course of its opinion, the circuit court reaffirmed that "First Amendment rights to 'freedom of speech, [and] of the press' do not create any per se right of access to government property or activities simply because such access might lead to more thorough or better reporting." *Id.* at 238.

In *Fisher v. King*, 232 F.3d 391 (4th Cir.2000), the Fourth Circuit Court of Appeals considered a challenge to the claim by a member of the public that the First Amendment provides him a right of physical access to an audio tape that was played in open court in a criminal trial, admitted into evidence, and for which he possesses a complete verbatim transcript. The Fourth Circuit concluded as follows:

Under the Supreme Court's decision in *Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the answer to this question is no. Of relevance here, in *Nixon*, certain members of the press argued that the First Amendment's guarantee of freedom of the press required the District Court for the District of Columbia to release to them for copying certain audio tapes that had been admitted into evidence during the criminal trial of several former advisors to President Richard Milhous Nixon. The Supreme Court flatly rejected this argument, holding that, under the circumstances, the First Amendment did not provide the general public a right of physical access to the tapes, and the press generally has no greater right to information about a trial superior to that of the

general public. *See id.* at 608–09, 98 S.Ct. 1306. The circumstances were that no restrictions were placed upon press access to, or publication of any information in the public domain (*i.e.* the press—including reporters of the electronic media—was permitted to listen to the tapes and report on what was heard); reporters also were furnished transcripts of the tapes, which they were free to comment upon and publish; the contents of the tapes were given wide publicity by all elements of the media; and there was no question of a truncated flow of information to the public. *See id.* at 609, 98 S.Ct. 1306.

*Id.* at 396. Thus, it was concluded that Fisher had no First Amendment right to access to the original recording of the audio tape.

In *United States v. McDougal,* 103 F.3d 651 (8th Cir.1996), *cert. denied,* 522 U.S. 809, 118 S.Ct. 49, 139 L.Ed.2d 15 (1997), the Eighth Circuit Court of Appeals considered the request by a group of media organizations and a non-profit citizens' group for physical access to a videotape recording of then President William Jefferson Clinton's deposition testimony used at trial in an underlying criminal case, *United States v. McDougal,* 940 F.Supp. 224 (E.D.Ark.1996). The access was sought in order to make copies of the videotape. The request for access was based on the First Amendment and common law rights of access to judicial records. *McDougal,* 103 F.3d at 652. The district court entered an order stating that public access to the transcript of President Clinton's deposition would be made available after the videotape deposition was presented to the jury. *Id.* at 653. By agreement of counsel for the parties in the underlying criminal case, portions of the deposition containing objections and argument were edited out. The edited videotape was presented to the jury, and at the

time the courtroom was open to the public and the public and appellants had the opportunity to view the edited videotape as it was viewed by the jury. The edited transcript was admitted into evidence, made a part of the record and copies thereof were made available to the public. *Id.* Thereafter, the appellants requested access to the videotape and Dow Jones & Co. requested a copy of the unedited transcript and access to the unedited videotape. Relying in part on *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 608, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the district court allowed access to the unedited transcript but denied all other access to the videotape. *Id.* at 654. The district court held that the press's First Amendment right had been "fully satisfied ... by allowing the press to attend the playing of the videotaped deposition and in providing full access to the written transcript." *McDougal,* 940 F.Supp. at 227. The Eighth Circuit agreed that "the First Amendment right of access to public information does not extend to the videotape of President Clinton's deposition testimony." *McDougal,* 103 F.3d at 659. The court noted that members of the public including the press were given access to the information contained in the videotape; no restrictions were placed on press access to that information. The court explained that the First Amendment does not give the press any right of access superior to that granted the general public and therefore, relying on *Nixon v. Warner Communications, Inc.,* held that the appellants "received all the information to which they were entitled under the First Amendment." *Id.* The court therefore affirmed the denial of additional access to the videotape as to both the press and public.

█ The foregoing survey of decisions in this and similar areas persuades the court that the right ENI asserts—the

right to record or broadcast an execution from within a prison—does not exist.

### D.

■ ENI argues that the challenged regulation is not "content neutral" and thus subject to strict scrutiny. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

ENI's argument on this point is particularly unpersuasive because it rests on a flawed notion of the term "content."

ENI's argument rests on the view that the "content" of an execution depicted through the form of written journals or verbal accounts is different than if depicted through the lens and tape of the audiovisual broadcast which ENI seeks to have authorized. The difference in content, according to ENI, is that the human accounts are subject to "spin" and perspective, whereas the broadcast is not. ENI argues, therefore, that the BOP is denying the public information based on its content.

Although "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task," *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the task in this case is not an onerous one. "The principal inquiry in determining content neutrality . . . is whether the government has adopted a

regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citing *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 295, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

■ Regulations that "by their terms distinguish favored speech from disfavored speech on the basis of ideas or views expressed are content based." *Turner,* 512 U.S. at 643, 114 S.Ct. 2445. If, on the other hand, the regulation is justified without reference to the content of the speech or serves purposes unrelated to the content, it is a content-neutral regulation, even if it has an incidental effect on some speakers or messages but not others. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

■ ENI seeks to provide news coverage and record the event in a form which ENI views as unique, but the form of news coverage does not disparage or blunt its content. In short, as to this aspect of ENI's argument, the medium is not the message, and ENI, as to the would-be messenger, is not being discriminated against by the BOP's regulation because of the medium or means by which ENI seeks to broadcast the execution. *See generally KPNX Broad. v. Superior Court,* 139 Ariz. 246, 678 P.2d 431, 441 (1984) (" 'news gathering right' . . . means nothing more nor less than the right to attend").[3] As explained in *Garrett,* and fully applicable here:

---

3. Content based regulations draw strict scrutiny because their purpose is typically related to the suppression of free expression and thus contrary to the First Amendment imperative against government discrimination based on viewpoint or subject matter. *See Texas v. Johnson,* 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Owing to the profound national commitment to robust, open debate, "[t]he First Amendment generally pre-

vents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (internal citations omitted). The government cannot favor one viewpoint over another. *See Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

In the present case, similarly, access is provided except for one purpose, to film executions. In order to sustain Garrett's argument we would have to find that the moving picture of the actual execution possessed some quality giving it "content" beyond, for example, that possessed by a simulation of the execution. We discern no such quality from the record or from our inferences therein. Despite the unavailability of film of the actual execution the public can be fully informed; the free flow of ideas and information need not be inhibited.

*Garrett,* 556 F.2d at 1278.

■ Having determined that the BOP's regulation is content neutral, it may nonetheless be regarded as a "time, place, and manner" restriction on expressive conduct. *See United States v. Yonkers Bd. of Educ.,* 747 F.2d 111, 114 (2d Cir.1984) (construing rule prohibiting reporter from tape recording civil trial as a "time, place, and manner" restriction). A "content-neutral" restriction of this type is permissible only if it is supported by a substantial government interest and does not unreasonably limit alternative avenues of communication. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). For the same reasons as explained in Part III.E. of this Entry, that is precisely the nature and effect of the government interest in enacting 28 C.F.R. § 26.4(f).

■ There is another reason why the BOP's regulation is not subject to strict scrutiny. As demonstrated by *United States v. Kerley,* 753 F.2d 617 (7th Cir. 1985), all that is at stake here

> is a limitation on the manner of news coverage; the media can do everything but televise the trial. The limitation can withstand constitutional scrutiny so long as it is reasonable and neutral, as with time, place, and manner restrictions generally.

*Id.* at 620–21. Many, many features of the media's coverage of a federal criminal trial discussed in *Kerley* are a good "fit" for understanding why the limitation on news coverage of the execution embodied in 28 C.F.R. § 26.4(c) is justified.

> Public access to criminal proceedings fosters confidence in the judicial system, provides a check on potential abuses in the system and promotes the truth-finding function of the trial. Kerley also has argued here that videotaping his trial will ensure that it is reported accurately by the media.

> Many of the reasons Kerley offers for allowing him to record or broadcast his trial are attractive.... It is important to note that the issue is not between open and closed proceedings. Rather, we are only concerned with whether it is reasonable to conclude that the marginal gains from videotaping and broadcasting an already public trial, which members of the public and media will be free to attend and to report on, are outweighed by the risks and uncertainties the procedure, in the minds of some, entails.

> . . . . .

> We are not persuaded by Kerley's arguments that the first amendment requires the courts to adapt to changing technology and allow him to videotape his trial. That cameras may be smaller, lighter and quieter is not a change having constitutional significance.

*Kerley,* 753 F.2d at 621–22. *Kerley,* of course, dealt with the question of broadcast cameras in the federal courtroom, and in doing so reaffirmed that there are limits on the form of media access to proceedings which occur in the courts, which by tradition are perhaps the most open public places in our society. In holding that a criminal trial may not be completely closed to the public, the Supreme Court emphasized,

[O]ur holding today does not mean that the First Amendment rights of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. "[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places."

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n. 18, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion) (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)) (citations omitted). The Supreme Court also found no constitutional violation in the denial of a press request for access to county jail facilities for the purpose of investigating conditions in the jail, noting it had "never intimated a First Amendment guarantee of a right of access to all sources of information within government control" and that the "undoubted right to gather news ... affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 11, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion). Thus, the First Amendment does not require unfettered access to government information.

### E.

 *Garrett* and similar cases viewed the issues presented there as simply ones of media access. The rationales for concluding that the media's right to access is not unfettered, though, have never been unmoored from the particular settings in which the claims have been considered. Nor can this case be separated from the fact that the access which ENI seeks is to a maximum security prison where an execution is to be carried out. In such a setting, "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Pell*, 417 U.S. at 822, 94 S.Ct. 2800. Thus, "[t]he Court in *Saxbe v. Washington Post, Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), noted that " 'prisons are institutions where public access is generally limited.' " *Id.*, at 849 (citation omitted). This truism reflects the fact that there are legitimate penological interests served by regulating access, e.g., security and confinement." *KQED*, 438 U.S. at 36 n. 29, 98 S.Ct. 2588 (Stevens, J., dissenting).

> *Procunier* and *Saxbe* are distinguishable in the sense that they were concerned with penal institutions which, by definition, are not "open" or public places. Penal institutions do not share the long tradition of openness, although traditionally there have been visiting committees of citizens, and there is no doubt that legislative committees could exercise plenary oversight and "visitation rights." *Saxbe*, 417 U.S. at 849, 94 S.Ct. at 2814, noted that "limitation on visitations is justified by what the Court of Appeals acknowledged as 'the truism that prisons are institutions where public access is generally limited.' [*Washington Post Co. v. Kleindienst*] 161 U.S.App.D.C. [75], at 80, 494 F.2d [994], at 999. *See Adderley v. Florida*, 385 U.S. 39, 41 [87 S.Ct. 242, 243, 17 L.Ed.2d 149] (1966) [jails]." *See also Greer v. Spock*, 424

U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military bases.)

*Richmond Newspapers,* 448 U.S. at 576 n. 11, 100 S.Ct. 2814.

■ Turning specifically to the prison environment in which the BOP regulation at 28 C.F.R. § 26.4(c) necessarily operates, the bedrock principle to be recognized is that "the core functions of prison administration [are] maintaining safety and internal security." *Turner v. Safley,* 482 U.S. 78, 92, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). ENI's claim must be considered in light of the special environment of a prison, where administrators "must be accorded wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Pardo v. Hosier,* 946 F.2d 1278, 1280–81 (7th Cir.1991) (internal quotations omitted).

■ Even if it could be concluded that the challenged regulation infringes on a First Amendment right, the regulation may be upheld. *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In evaluating prison regulations that allegedly infringe on inmates' constitutional rights, the Supreme Court has set forth this test: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254. The Court explained its adoption of this standard as "necessary if 'prison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)).

■ This standard is applicable to ENI's claim because, even though ENI is not an inmate, the claim it asserts can only become operative inside the USPTH.

"*Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). ENI's claim that the *Turner* standard is inapplicable here is unpersuasive. *See Thornburgh v. Abbott,* 490 U.S. 401, 410 n. 9, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (explaining that the *Turner* standard for employing a standard of reasonableness in considering a challenge to a prison regulation governs "regulations that affect[ ] rights of prisoners *and* outsiders") (emphasis in *Thornburgh*).

■ *Turner* listed four factors which are relevant to a determination of the reasonableness of prison regulations and practices: 1) Whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest; 2) If alternative means of exercising the constitutional right remain open to prison inmates; 3) The impact an accommodation of the asserted right would have on the guards and other inmates, and on the allocation of prison resources; and 4) The absence of ready alternatives. 482 U.S. at 89–91, 107 S.Ct. 2254.

■ The BOP has advanced four purposes for its regulation: "(i) the prevention of the sensationalizing of executions, (ii) the preservation of the solemnity of executions, (iii) the maintenance of security and good order in the Federal Prison System, and (iv) protection of the privacy rights of a condemned individual, the victims, their families and those who participate in carrying out the execution." These rationales have been verified through the affidavit of Warden Lappin, who is responsible for the orderly operation of the USPTH and the execution of BOP procedures relating to it. His responsibility includes implementing the regulation found at 28 C.F.R. § 26.4(f), and his affidavit regarding the rationales

for the procedures expands on them in each instance. Drawing from his experience in corrections, Warden Lappin makes the following points: *first,* that to maintain security and good order in a prison setting, it is important that inmates understand and believe that they will be treated like human beings and not dehumanized; *second,* that the government's interests in not sensationalizing and preserving the solemnity of executions is based upon the danger that if prison inmates were to see the execution on television or receive word of the televised event through other means, the inmates may well see the execution as "sport" which dehumanizes them; *third,* that when inmates feel that they are dehumanized or devalued as persons, agitation amongst the inmates is frequently fomented, which in turn can lead to prison disturbances; *fourth,* that a broadcast would violate the privacy of condemned persons, and would also "strip[ ] away" the privacy and dignity of victims and their families; and *fifth,* that "a public broadcast of the execution would violate the privacy and seriously put at risk the safety of those charged with implementing the sentence of death."

Warden's Lappin's explanation for the BOP regulation is not shared by another veteran of the corrections profession, Raymond K. Procunier. However, Mr. Procunier's views do not appear to be based on any personal knowledge or study of conditions within the BOP or the USPTH in particular, and the fact that his views differ does not render Warden's Lappin's explanation inadequate.

Warden Lappin's explanations depict an environment which has been characterized as one of unremitting tension between guards and inmates, who are forced to coexist "in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing

so." *Wolff v. McDonnell,* 418 U.S. 539, 561, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). When a measure is taken or a measure is limited by recognition of this fact, and in so doing promotes the security of the prison, *see Hewitt v. Helms,* 459 U.S. 460, 473, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ("[t]he safety of the institution's guards and inmates is perhaps the fundamental responsibility of the prison administration"); *Pell,* 417 U.S. at 823, 94 S.Ct. 2800 (security is "central to all other corrections goals"), it is difficult to gainsay the judgment of prison administrators.

■ "The procedures surrounding an execution 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Cal. First Amendment Coalition,* 150 F.3d at 982–83 (quoting *Pell,* 417 U.S. at 827, 94 S.Ct. 2800).

■ There is no substantial evidence indicating an exaggerated response here. The court therefore finds it appropriate, and indeed virtually imperative, to defer to the BOP. Whatever First Amendment protection exists for viewing executions, it is not violated by the BOP's explicit regulation against recording or broadcasting them to the public.

### III. Conclusion

The proper question here, initially, is whether 28 C.F.R. § 26.4(f)'s prohibition on the recording and broadcasting of an execution unwarrantedly abridges the opportunities for communication of thought. It does not.

Even if the court concluded otherwise, however, the setting in which this case

arises, and in which any foreseeable challenge to § 26.4(f) would arise, controls the outcome. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254. This responsibility is further complicated when certain functions, such as an execution, are to be carried out. The proper inquiry in this case is whether the challenged regulation is "reasonably related to legitimate penological interests," *id.* at 89, 107 S.Ct. 2254, and on the basis of the evidence and the arguments before it the court concludes that 28 C.F.R. § 26.4(f) meets that standard. No other conclusion is warranted—nor indeed would another conclusion be possible—in the circumstances here.

Based on the facts and law set forth in this Entry, ENI and the intervenor are not entitled to the relief they seek. The Defendants, therefore, prevail in this action. Final judgment consistent with this Entry shall now issue.

## JUDGMENT

The court, having this day made its Entry,

**IT IS HEREBY ADJUDGED AND DECREED** that the plaintiff and the intervening plaintiff take nothing by their complaints and that judgment is entered for the defendants and against the plaintiff and the intervening plaintiff.